## Commonwealth ex rel. Smillie *v.* McElwee et al.

Argued June 17, 1937. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Warwick Potter Scott,* with him *E. Arnold Forrest* and *Robert T. McCracken,* for relator.

*Frank J. Bradley,* with him *Leon H. Fox,* for respondents.

*A. B. Geary,* of *Geary & Rankin,* for New Board, Delaware County.

*Herman J. Goldberg* and *Wm. A. Schnader,* for Old Board, Luzerne County.

*Leo W. White, Richard B. Sheridan, Thomas F. Farrell* and *John P. Kelly,* for New Board, Luzerne County.

*Scott Fink,* for New Board, Westmoreland County.

*John M. Kelly,* for New Board, Lackawanna County.

OPINION BY MR. JUSTICE MAXEY, July 7, 1937:

The question presented in these quo warranto proceedings is the constitutionality of the Act of May 28, 1937, P. L. 939, and applying to counties of the third class, to wit: Luzerne, Lackawanna, Westmoreland, Delaware and Montgomery. In section 1 it purports to create "a board to be known as the Board for the Assessment and Revision of Taxes which shall be composed of three members resident of the county for which appointed. The members of said board shall be appointed by the Auditor General of the Commonwealth to serve for terms of four years each. Vacancies happening in said office shall be filled by appointment by the Auditor General for the unexpired terms. The boards so appointed shall have all the powers and perform all the duties vested in and imposed upon the Board for the Assessment and Revision of Taxes in counties of the third class by the act [of June 26, 1931, P. L. 1379] to which this is a supplement. The salary of the members of said board shall be fixed by the salary board of the county. Whenever the salary board shall be convened for the purpose of fixing salaries under this act or the act to which this is an amendment, the members of the board for the assessment and revision of taxes shall become members of the salary board of the county, with the same power as now conferred by law on the other members of the salary board of the county." Section 2 of the act provides that "Upon the effective date of this act, the terms of the members of the board of revision of taxes in counties of the third class shall cease and terminate, and the members appointed by the Auditor General shall take office for the term for which appointed. They shall be entitled to the compensation theretofore fixed by the salary board for members of the board of revision of taxes, until changed or altered under the provisions of this act. All other appointees and employees of such boards shall continue to hold their respective positions and be entitled to receive the same

compensation as now fixed by the salary board, subject to removal by the board of revision provided for by this act, and the fixing of their compensation by the salary board as provided in this act." Section 3 contains a severability clause. Section 4 repeals section 1 of the Act of June 26, 1931, creating in third class counties "a board for the assessment and revision of taxes, providing for the appointment of the members of such board by the county commissioners," etc.

The constitutionality of this act is challenged by the three members of the Board for the Assessment and Revision of Taxes for the County of Montgomery, who were appointed under the Act of June 26, 1931, and whose terms will not expire until the first Monday of January, 1940.

They contend that the Act of May 28, 1937, P. L. 939, does not abolish the office held by the incumbents under the Act of 1931 and for the legislature to attempt to remove an appointive officer prior to the expiration of his term without abolishing his office offends Article VI, section 4 of the Constitution which reads, in part, as follows: "Appointed officers . . . may be removed at the pleasure of the power by which they shall have been appointed."

It is also contended that the Act of 1937 violates sections 3 and 6 of Article III of the Constitution in that it contains more than one subject and seeks to amend and extend two acts, that of June 26, 1931, P. L. 1379, and the Salary Board Act of March 31, 1876, P. L. 13. Section 3 of Article III of the Constitution provides: "No bill, except general appropriation bills, shall be passed containing more than one subject. . . ." Section 6 of Article III provides in its entirety: "No law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only, but so much thereof as is revived, amended, extended or conferred shall be reënacted and published at length."

It is further contended that "the Act of 1937 violates section 20 of Article III of the Constitution because by that act the General Assembly attempts to delegate to a special commission power to perform municipal functions."

In analyzing this act preparatory to determining whether or not it trenches upon the Constitution, one is impressed with the fact that it violates the principle of "home rule," i. e., local self-government, which, like the tripartite separation of governmental powers, is a vital part of both the foundations and the general framework of our State and Federal governments. In many states, notably New York, the principle of "home rule" as operative in the selection by the local electorate or by such electorate's chosen officials of public servants to administer matters of local concern, is expressly safeguarded by constitutional provisions. In other states, notably Michigan, the principle of "home rule" is declared by the highest courts of these states to be implicit in the constitution. Some of the most eminent juristic authorities uphold the latter view.

Cooley in his "Constitutional Limitations" (8th ed.), Vol. 1, page 385, aptly says: "In the examination of American constitutional law, we shall not fail to notice the care taken and the means adopted to bring the agencies by which power is to be exercised as near as possible to the subjects upon which the power is to operate. In contradistinction to those governments where power is concentrated in one man, or one or more bodies of men, whose supervision and active control extends to all the objects of government within the territorial limits of the State, the American system is one of complete decentralization, the primary and vital idea of which is, that local affairs shall be managed by local authorities, and general affairs only by the central authority. . . . The system is one which almost seems a part of the very nature of the race to which we belong. A similar subdivision of the realm for the purposes of municipal gov-

ernment has existed in England from the earliest ages, and in America, the first settlers, as if instinctively, adopted it in their frame of government, and no other has ever supplanted it, or even found advocates. In most of the colonies the central power created and provided for the organization of the towns; in one at least the towns preceded and created the central authority; but in all, the final result was substantially the same, that towns, villages, boroughs, cities, and counties exercised the powers of local government, and the Colony or State the powers of a more general nature. The several State constitutions have been framed with this system in view, and the delegations of power which they make, and the express and implied restraints which they impose thereupon, can only be correctly understood and construed by keeping in view its present existence and anticipated continuance. There are few of the general rules of constitutional law that are not more or less affected by the fact that the powers of government, instead of being concentrated in one body of men, are carefully distributed, with a view to being exercised with intelligence, economy, and facility, and as far as possible by the persons most directly and immediately interested." De Tocqueville in his "Democracy in America," c. 5, says: "The townships . . . are independent in all that concerns themselves, and among the inhabitants of New England I believe that not a man is to be found who would acknowledge that the state has any right to interfere in their local interests. The towns of New England buy and sell, prosecute or are indicted, *augment or diminish their rates, without the slightest opposition on the part of the administrative authority of the State* [italics supplied]."

In *Rathbone v. Wirth*, 150 N. Y. 459, 45 N. E. 15, the Court of Appeals of New York referred to local self-government as "a right which inheres in a republican government, and with reference to which our constitution was framed. . . . The principal is one which is

. . . fundamental in our governmental system." It refers to "the importance which the people attach to the preservation of this right in the management of their local affairs. It means the right to choose their local officers, in all its reality, or it means nothing. . . . This right of self-government lies at the foundation of our institutions and cannot be disturbed or interfered with, even in respect to the smallest of the divisions into which the state is divided for governmental purposes, without weakening the entire foundation; and hence it is a right not only to be carefully guarded by every department of the government, but every infraction or evasion of it to be promptly met and condemned."

In *The People v. Hurlbut,* 24 Mich. 44, the Supreme Court of Michigan said: "The doctrine that within any general grant of legislative power by the Constitution there can be found authority thus to take from the people the management of their local concerns, and the choice, directly or indirectly, of their local officers, . . . would be somewhat startling to our people, and would be likely to lead hereafter to a more careful scrutiny of the charters of government framed by them, lest sometime, by an inadvertent use of words, they might be found to have conferred upon some agency of their own, the legal authority to take away their liberties altogether. . . . We have taken great pains to surround the life, liberty, and property of the individual with guaranties, but we have not, as a general thing, guarded local government with similar protections. We must assume either an intention that the legislative control should be constant and absolute, or, on the other hand, that there are certain fundamental principles in our general framework of government, which are within the contemplation of the people when they agree upon the written charter, subject to which the delegations of authority to the several departments of government have been made. That this last is the case, appears to me too plain for serious controversy. . . . The circumstances from which these

implications arise are: First, that the Constitution has been adopted in view of a system of local government, well understood and tolerably uniform in character, existing from the very earliest settlement of the country, never for a moment suspended or displaced, and the continued existence of which is assumed; and, second, that the liberties of the people have generally been supposed to spring from, and be dependent upon, that system."

Cooley in his work on "Taxation," Vol. 1 (4th ed.), sec. 416, makes the following statement: "Of all customary local powers, that of taxation is most effective and most valuable. To give local government without this would be little better than a mockery. If any state has the power to withhold it, the exercise of such a power would justly be regarded as tyranny. Indeed, local taxation is so inseparable an incident to republican institutions that to abolish it would be nothing short of a revolution."

One of the chief grievances of the Colonists against Great Britain was that the latter denied the former any voice in the matter of determining the amount of taxes the Colonists were required to pay. On January 30, 1768, Samuel Adams wrote to Dennys Deberdt, the Massachusetts colonial agent in London, as follows: "You will observe that the House still insist upon that inestimable right of nature and the Constitution of being taxed only by representatives of their own free election; which they think is infringed by the late acts for establishing a revenue in America."

The act now challenged places in the hands of a state officer the authority to appoint, in each of the third class counties of Pennsylvania, officials clothed with the power of "making all assessments of persons, property, and occupations now or hereafter made subject to assessment for taxation for county, borough, town, township, school and poor purposes" (see sec. 3 of the Act of June 26, 1931, P. L. 1379) and "making and revising the

triennial assessments and valuations, increasing or decreasing the same as in their judgment may seem proper" (see sec. 7 of the Act of 1931, supra). If, as Cooley says, "the American system is one of complete decentralization, the primary and vital idea of which is that local affairs shall be managed by local authorities," this act giving control to a state official, through the power of appointment by him of county assessors of "persons, property, and occupations," is an application of an alien ideology of government which has not hitherto found legislative favor in this Commonwealth.

The sixty-seven counties of Pennsylvania are divided into eight classes and only in the five counties comprising the third class is there set up a system of making local assessments which denies to the people of the respective counties the right either to choose the public servants who assess them or to choose the officials who select those public servants. In counties of the 4th, 5th, 6th, 7th and 8th classes, totalling sixty of the sixty-seven counties of the State, the power of assessing property is in the hands of county commissioners. In Allegheny County, a county of the 2nd class, assessments are made by a board appointed by the county commissioners. In Philadelphia County, a county of the first class, the Board for the Assessment and Revision of Taxes has heretofore been appointed by a board consisting of the Common Pleas Judges of that county. Under the legislation enacted in the spring of 1937 (and this day passed upon by this Court), it is provided that there the appointment of four members shall be by the City Controller, who is elected by the electorate of the county (the county and city being co-terminous), and the remaining three members shall be appointed by the City Treasurer, who is elected by the same electorate.

He who has the power to appoint assessors has the power to control the assessments, which is the power to tax, and as Mr. Chief Justice MARSHALL said in *McCul-*

*loch v. Maryland,* 4 Wheat. 316, "the power to tax involves the power to destroy."

In another respect also this act introduces an anomaly into our system of government. It provides that the salary of the members of the Board for the Assessment and Revision of Taxes shall be fixed by the Salary Board and it then makes the members of the former board members of the latter. In other words, the assessors act upon the fixing of their own salaries. It is true that there are four other members of the Salary Board, to wit, the three County Commissioners and the County Controller, but if the three members of the Board for the Assessment and Revision of Taxes can secure the vote of any one of these other four officials, they can fix their own salaries without limit. All the members of the Board for the Assessment and Revision of Taxes may belong to the same political party and as at least one of the county commissioners will belong to the same party, it follows that four officials belonging to the same party are clothed by this act with the power to fix the salaries of three of these officials, those three being the members of the Board for the Assessment and Revision of Taxes. They are expressly clothed by this law with 75% of the power necessary to fix their own salaries (four being a majority of the Salary Board). No such power has ever heretofore been given to any public official in the State of Pennsylvania. That such a grant of power even to members of the highest law-making body of the State is offensive to the people's conception of official propriety is evidenced by the Constitution which the people of this Commonwealth ordained and established. Article II, section 8 of the Constitution specifically provides that "no member of either House shall, during the term for which he may have been elected, receive any increase of salary, or mileage, under any law passed during such term." Section 33 of Article III, provides that "a member who has a personal or private interest in any measure or bill proposed or

158

pending before the General Assembly shall disclose the fact to the House of which he is a member, and shall not vote thereon." To make any one "the arbiter in his controversies" has been characterized as "the creation of an arbitrary and irresponsible authority, neither legislative, executive, nor judicial, and wholly unknown to constitutional government": Cooley's "Constitutional Limitations" (8th ed.), Vol. 1, page 356. The act now challenged makes the members of the Board for the Assessment and Revision of Taxes *the arbiters* in the question that must inevitably arise as to the amount of salaries they shall receive.

We refer to these departures from the traditional precepts and practices of American law-making, not as breaches of the letter of the Constitution but as reasons why the intendment the judiciary customarily entertains in favor of the constitutionality of an act of assembly loses much of its force when the judiciary is confronted with an act so dissonant with American constitutional concepts as the one now challenged. In *State ex rel. White v. Barker,* 57 L. R. A. 244, the Supreme Court of Iowa well said: "Written constitutions should be construed with reference to and in the light of well-recognized and fundamental principles lying back of all constitutions, and constituting the very warp and woof of these fabrics. A law may be within the inhibition of the Constitution as well by implication as by expression." In *Page v. Allen,* 58 Pa. 338, 345, Mr. Chief Justice THOMPSON, speaking for this court, said that he would not assent to the proposition "that the inhibitions of the Constitution must always be expressed. They are equally effective and not less to be regarded when they arise by implication. . . ."

We sustain the challenge to this act because it contravenes the prescriptions of section 4 of Article VI of the Constitution which declares that "appointed officers . . . may be removed at the pleasure of the power by which they shall have been appointed." No principle

is more firmly imbedded in our law than that when the Constitution expressly provides a single method for accomplishing a particular purpose that method is exclusive. See *Bowman's Case*, 225 Pa. 364, 367, 74 A. 203; *Com. ex rel. v. Hoyt*, 254 Pa. 45, 53, 98 A. 782; *Com. v. Likeley*, 267 Pa. 310, 110 A. 167, and *Com. ex rel. v. Kelly et al.*, 322 Pa. 178, 187, 185 A. 307. The abolition of certain offices is a legislative function, but the abolition of *officers* is not. The act challenged makes no attempt to abolish the Board for the Assessment and Revision of Taxes created by the Act of 1931. It leaves the office, both in name and functions, undisturbed and unaffected, but it does attempt to replace the incumbents with selections of the Auditor General. As the legislature did not appoint the incumbents, it cannot remove them. Their titles to office did not come from the legislature. What under our system of government the legislature does not create it cannot destroy.

In *Georges Township School Directors*, 286 Pa. 129, 133 A. 223, this court, in referring to the constitutional provision that appointed officers can be removed only by the power that appointed them, said: "This applies not only to officers designated by the governor, but to those permitted by the legislature to make the appointment in question, whether the employment be by the State, a county or municipality." That in the instant case the sole purpose of the act in question was to oust one set of members of the Board for the Assessment and Revision of Taxes appointed by the County Commissioners and to substitute for them another set appointed by the Auditor General of the State, is so obvious as to stamp incredibility on contradiction. This court said in *Appeal of City of Scranton School District*, 113 Pa. 176, 190, 6 A. 158: "Attempts in covert modes to defeat its [the Constitution's] plain provisions, must be set aside with the same certainty as when the methods are open." The act now before us is a legislative usurpation of power. In placing it on the statute books the legisla-

ture stepped beyond the landmarks established by the Constitution and what it did when thus "out of bounds" is of no validity. "There is no position which depends upon clearer principle than that every act of a delegated authority contrary to the tenor of its commission is void" (Alexander Hamilton in the "Federalist").

Having decided that the act attempting by legislation to remove the relators from the office to which they were duly appointed is an act in plain contravention of the explicit mandate of the Constitution as expressed in Article VI, section 4, it is not necessary to discuss or to decide whether the act contravenes other constitutional provisions. Whenever any act conflicts with *any* section of the fundamental law, it is entitled to no further consideration, for whenever the will of the legislature as declared in a statute is opposed to the will of the people as declared in the Constitution, the former must yield and the latter prevail.

There have been filed in this court petitions intervening in behalf of the members of the Boards of Assessment and Revision of Taxes of the Counties of Luzerne, Lackawanna, Westmoreland and Delaware, appointed under the Act of June 26, 1931, P. L. 1379.

Judgment is entered in favor of the relator, that the defendants each and all be ousted and altogether excluded from the office of member of the Board for the Assessment and Revision of Taxes in the County of Montgomery, defendants to pay the costs.