HARRISBURG SCHOOL DISTRICT, Harrisburg School Board, Joseph C. Brown, Linda M. Cammack, Kenneth Leister, Judith C. Hill, Wanda R.D. Williams, individually, and as parent and natural guardian of Rauwshan Williams, Ricardo A. Davis, individually and as parent and natural Guardian of Jeremiah Stephenson and Tiffany Davis, Clarice Chambers, Joy Ford, individually and as parent and natural guardian of Samantha Wilson, Grace Bryant, Glenise Cobb–Wingfield, individually, and as parent and natural guardian of Johnathan Wingfield and Asia Wingfield, and Citizens Concerned for Children First, By Dwayne Blount and Dale Carter, Trustees Ad Litem, Petitioners,

v.

Eugene W. HICKOK, Secretary of Education, Commonwealth of Pennsylvania, Stephen R. Reed, Mayor of Harrisburg, Jane/John Doe I, Jane/John Doe II, Jane/John Doe III, Jane/John Doe IV, Jane/John Doe V, Potential Members of the Board of Control for the Harrisburg School District, Respondents.

Commonwealth Court of Pennsylvania.

Argued April 4, 2001.

Decided June 22, 2001.

---

Kelley, J., concurred in part, dissented in part, and filed opinion in which Smith, J., joined in part.

Leadbetter, J., dissented and filed opinion.

Ronald M. Katzman, Harrisburg, for petitioners.

Daniel J. Doyle, Harrisburg, for respondent, Secretary of Education.

Todd P. Prugar, Harrisburg, for respondents, Mayor of Harrisburg, Jane/John Doe, et al.

Before DOYLE, President Judge, COLINS, McGINLEY, SMITH, PELLEGRINI, KELLEY, and LEADBETTER, Judges.

PELLEGRINI, Judge.

Before this Court are preliminary objections in the nature of a demurrer filed by the respondents in the above-captioned action (collectively, the Commonwealth) in response to a petition for review in the nature of a complaint in equity and declaratory judgment filed by the petitioners in the above captioned action (collectively, the Harrisburg School District) challenging the constitutionality of Act 91 of 2000 (the Amendment/Act 91), an amendment to the Education Empowerment Act, Act No. 2000–16(EEA), 24 P.S. §§ 17–1701–B—17–1716–B.

## I.

### A.

The EEA was enacted on May 10, 2000, and authorized the Secretary of Education to place the control of a school district in a Board of Control where the school district had a history of low Pennsylvania System of State Assessment (PSSA) test scores. Those school districts that had a history of low test scores were to be placed on an Education Empowerment List. Placement on the List triggered a process that required the school district to form an Empowerment Team that would develop an Improvement Plan. Once approved by the Secretary of Education, the Improvement Plan had to be implemented by the affected school board. Section 1703–B of the School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 17–1703–B. If the affected school district did not meet the goals established in the plan within three years, pursuant to Section 1705–B, 24 P.S. § 17–1705–B, the school district was declared an "Education Em-

powerment District." The Board of Control assumed all powers and duties conferred by law on the Board of School Directors with the exception of the power to levy taxes. Section 1706–B, 24 P.S. § 17–1706–B. When an affected school district had met the goals in its Improvement Plan and no longer had a history of low test performance, control was restored to the Board of School Directors. Section 1710–B, 24 P.S. § 17–1710–B.

While this was the process established by which the General Assembly would treat school districts with historically low test scores, the Harrisburg School District was treated differently under the now repealed Section 1707–B of the EEA, 24 P.S. § 17–1707–B (commonly referred to as the "Reed Amendment" after the current Harrisburg Mayor Stephen Reed). Section 1707–B defined "certain school districts" as a "school district of the second class with a history of low test performance which is coterminous with the city of the third class which contains the permanent seat of government," i.e., the Harrisburg School District. Under that provision, the Secretary was directed to waive the Harrisburg School District from inclusion on the Education Empowerment List removing from that school district the opportunity to implement an Improvement Plan but immediately certify it as an Education Empowerment District triggering the appointment of a Board of Control. The Board of Control would not be a three-member board appointed by the Secretary but instead the Mayor of Harrisburg who was to appoint a five-member board that served at his pleasure. The Mayor, rather than the affected school district, was also to appoint an Education Empowerment Team to develop an Improvement Plan for transmission to the Department of Education. The Department was not required to appoint an academic advisory team to assist the Empowerment Team in develop-

ing the Improvement Plan, and while the empowerment teams in other affected school districts elected their chairperson, the team to be appointed by the Mayor under the Reed Amendment was to be chaired by the Mayor or his designee.

In response, the Harrisburg School District filed a complaint alleging, *inter alia,* that the Reed Amendment was unconstitutional as special legislation and violated equal protection rights because it treated that school district different from any other school district in the Commonwealth by placing it under the control of a Board of Control that was controlled by the Mayor rather than the affected school district. It also filed a motion for a preliminary injunction based on what it considered disparate treatment under the Reed Amendment. By order dated June 30, 2000, we granted a preliminary injunction enjoining the Reed Amendment from taking effect pending further order of this Court. On appeal from that order, the Supreme Court affirmed, agreeing that the Reed Amendment was unconstitutional as special legislation. *Harrisburg School District v. Hickok (Harrisburg II),* 563 Pa. 391, 761 A.2d 1132 (2000). As to the petition itself, we dismissed the Commonwealth's preliminary objections that the Reed Amendment was proper, concluding that the Reed Amendment violated Article III, Section 32 of the Pennsylvania Constitution as special legislation. Before the case was finally resolved, most likely by judgment on the pleadings or summary judgment, we dismissed the Harrisburg School District's complaint as moot because the General Assembly, in direct response to the Supreme Court's decision, enacted Act 91 to amend the language of the Reed Amendment which led to the filing of this petition and the instant preliminary objections.

### B.

In an attempt to avoid violating the prohibition against special legislation, the Amendment redefined the "class" of school districts subject to mayoral control. It now provided that a school district subject to appointment of a mayoral board of control had to have a population in excess of 45,000:

"[A] School District of the Second Class which has a history of extraordinarily low test performance, which is coterminous with a City of the Third Class that has opted under the "Optional Third Class City Charter Law" or 53 Pa.C.S. Pt. III Subpt. E to be governed by a mayor-council form of government and which has a population in excess of forty-five thousand (45,000)."

Section 9 of Act 91, amending Section 1707–B of the Public School Code of 1949, 24 P.S. § 17–1707–B. The Amendment also provided that control by the Mayor could only be exercised where there was a history of "extraordinarily low test performance" rather than just low test scores.[1] By incorporating Sections 693, 694 and 695 of the School Code, 24 P.S. §§ 6–693, 6–694 and 6–695, that apply to Fiscal Boards of Control, the Amendment further gave the Board of Control appointed by the Mayor the power to compel the School Board to raise taxes in certain circumstances by seeking an order from the court of common pleas for it to do so.

The Harrisburg School District has filed a petition for review to have the Amendment to Act 16 declared unconstitutional contending that the General Assembly acted unconstitutionally in enacting the Amendment.[2] Specifically, it asserted in its petition the following five counts:

- **Count I—Violation of Article III, Section 32 of the Pennsylvania Constitution.** The Amendment creates a sub-class of school districts for special treatment, including Harrisburg, in violation of Article III, Section 32 which prohibits the General Assembly from passing local or special law regulating school districts.

- **Count II—Violation of XIV Amendment to the United States Constitution.** The Amendment violates the Equal Protection Clause of the Fourteenth Amendment because it treats the sub-class of extraordinarily low performing school districts differently from all other similarly situated school districts.

- **Count III—Violation of Article IX, Section 3 of the Pennsylvania Constitution.** The Amendment unconstitutionally changes the form of Harrisburg's government.

- **Count IV—Violation of Article III, Section 31 of the Pennsylvania Constitution.** Giving the power to the Board of Control violates Article III, Section 31 which prohibits the General Assembly from delegating to any special commission the power to levy taxes. The Board of Control is a special commission and the Amendment gives the Board the taxing power the Constitution forbids.

---

1. While under Act 16 low test scores were defined as 50% or more of students who scored in the bottom 25% or below basic level of performance on the PSSA test in math and reading, *see* 24 P.S. § 17–1702–B, under the Amendment, extraordinarily low test scores are defined as a school district having a combined average of 60% or more of students that score in the bottom group of 25% or below.

2. The Harrisburg School District also requested preliminary injunctive relief but by order of this Court dated December 15, 2000, we denied the preliminary injunction finding that the Harrisburg School District had failed to show a clear right to relief necessary to grant a preliminary injunction.

● **Count V—Violation of Article VI, Section 7 of the Pennsylvania Constitution.** The Amendment transfers the powers of the School Board to the Board of Control, thereby removing the School Board members from office in contravention of Article VI, § 7 of the Pennsylvania Constitution.

█ In response to the petition for review, the Commonwealth has filed preliminary objections contending that each of those counts fails to set forth a constitutional violation and that the Harrisburg School District's complaint should be dismissed.[3] Regarding our standard of review for preliminary objections, previously, preliminary objections were only to be sustained in cases that were clear and free from doubt from all of the facts plead, and that the pleader was unable to prove facts legally sufficient to establish his right to relief. *Commonwealth v. Labor Relations Board,* 545 Pa. 288, 681 A.2d 157 (1996); *Bower v. Bower,* 531 Pa. 54, 611 A.2d 181 (1992). However, in *Pennsylvania AFL–CIO v. Commonwealth,* 563 Pa. 108, 757 A.2d 917 (2000), that standard appears to have been changed so that it is now whether the *law* under consideration is clear and free from doubt.

## II.

## COUNT I

### SPECIAL LEGISLATION

The Commonwealth contends that the Amendment is in accord with Article III, Section 32[4] of the Pennsylvania Constitution because the class of school districts that it creates is not a closed class of one, and the class bears a reasonable relationship to the object of improving the performance of the school districts with the most significant problems. In support of this claim, the Commonwealth argues that the classification is a rational one because it is based on test scores of school districts with a history of low versus extraordinarily low PSSA test performance. It notes that it follows models adopted by other urban school districts in Chicago and Philadelphia, and because, under Article III, Section 14[5] of the Pennsylvania Constitution (Education Clause), education is ultimately a state responsibility, the General Assem-

---

**3.** The Commonwealth also argues that the Harrisburg School District lacks standing to bring this petition but acknowledges that we rejected this same argument in our prior decision on the Harrisburg School District's petition challenging the constitutionality of Act 16. As we stated previously, based on our Supreme Court's decision in *Defazio v. Civil Service Commission of Allegheny County,* 562 Pa. 431, 756 A.2d 1103 (2000), that argument is meritless because the Harrisburg School District has a substantial, direct and immediate interest in the outcome of this matter, and, therefore, has standing. Therefore, the Commonwealth's preliminary objection based on standing is denied.

**4.** Article III, Section 32 of the Pennsylvania Constitution provides:

> The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and

specifically the General Assembly shall not pass any local or special law.

> 1. Regulating the affairs of counties, cities, townships, wards, boroughs, *or school districts.* (Emphasis added.)
> \* \* \*
> Nor shall the General Assembly indirectly enact any special or local law by the party repeal of a general law; but laws repealing local or special acts may be passed.

Article III, Section 32 was originally adopted as Article III, Section 7, but in 1967, Article III was amended and its sections renumbered.

**5.** Article III, Section 14 of the Pennsylvania Constitution provides:

> The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth.

bly is entitled to freely experiment in the area of education. The Harrisburg School District argues that this violates Article III, Section 32 [6] because it is designed to only include Harrisburg in the classification and, in any event, no rational reason exists for the General Assembly to create that classification in the way that it did.[7]

Article III, Section 32 of the Pennsylvania Constitution was adopted to end "[t]he evil [of] interference of the legislature with local affairs without consulting the localities and the granting of special privileges or exemptions to individuals or favored localities." *Commonwealth v. Gilligan*, 195 Pa. 504, 513, 46 A. 124, 126 (1900); *Haverford Township v. Siegle*, 346 Pa. 1, 28 A.2d 786 (1942). Although the people of Pennsylvania purposefully restricted the General Assembly's ability to enact special and local legislation, the Constitution does not require that all legislation be applicable to the entire Commonwealth. Article III, Section 20 specifically grants to the legislature the power to classify counties, cities, boroughs, school districts and townships according to population and provides that all laws passed relating to such classes shall be deemed general legislation. Where, however, "the class to which a statute is made is unnecessarily restricted or improperly selected, still the law is special." *Chalmers v. City of Philadelphia*, 250 Pa. 251, 256, 95 A. 427, 429 (1915).

For nearly 70 years after the adoption of the proscription against local and special laws, population was recognized as the sole valid ground for classification of municipalities. However, in *Haverford Township*, our Supreme Court, in upholding as constitutional legislation requiring a police civil service for all boroughs and first class townships that had more than three police officers, recognized that the General Assembly had the ability to create classifications based on something other than population if it did not establish a closed class. The current state of the law now is that the General Assembly may establish classifications without violating Article III, Section 32 of the Pennsylvania Constitution only so far as to see that it is founded on real distinctions between the local government classified and not on artificial or irrelevant ones used for the purpose of evading constitutional prohibition. *Freezer Storage v. Armstrong Cork. Co.*, 476 Pa. 270, 382 A.2d 715 (1978); *Harrisburg School District v. Hickok*, 762 A.2d 398 (Pa.Cmwlth.2000).

Under that standard for determining whether legislation is special or general, to grant the Commonwealth's preliminary objection to this count, the class of extraordinary failing school districts created by the Amendment must not be closed, and if not closed, must be created based on real and pertinent distinctions as opposed

---

6. Legislation enacted by the General Assembly carries a strong presumption of constitutionality, and the party challenging the constitutionality of any statute bears a heavy burden of demonstrating that the statute is clearly, palpably and plainly unconstitutional. *Commonwealth v. Burnsworth*, 543 Pa. 18, 669 A.2d 883 (1995).

7. Our Supreme Court in *Appeal of Torbik*, 548 Pa. 230, 241, 696 A.2d 1141, 1146 (1997), quoting from *Heuchert v. State Harness Racing Commission*, 403 Pa. 440, 446–47, 170

A.2d 332, 336 (1961), explained what constituted a special law:

> [A] special law is the opposite of a general law. A special law is not uniform throughout the state or applied to a class. A general law is. It is well known that the Legislature has classified cities and counties. A law dealing with all cities or all counties of the same class is not a special law, but a general law, uniform in its application. But a law dealing with but one county of a class consisting of ten, would be local or special.

to artificial or irrelevant ones. The distinctions used by the General Assembly in creating a class of extraordinary failing school districts that justifies the distinction from other failing school districts and justifies immediate placement of the school district under a Board of Control, giving the Board of Control the ability to seek tax increases and having the Mayor rather than the Secretary appoint the "at will" Board, are:

- the School District involved must be a School District of the Second Class;
- the municipality involved is a third class city that has opted under the Optional Third Class City Law to adopt a Mayor Council form of government;
- the Optional Third Class City must have a population of more than 45,000;
- the Optional Third Class City must be co-terminus with the Second Class School District; and
- the School District must have a history of extraordinarily low test scores.

As to whether these are real and pertinent distinctions, we must look to see if they justify treating the school districts that fall within other districts similarly situated in the Commonwealth. In that respect, there must be a rational reason to immediately place those school districts under a Board of Control and have a Mayor appoint the Board of Control rather than the Secretary of Education.

The number and oddness of the distinctions that mix and match a class of school with a particular subclass of a third class city that itself is a particular subclass of a home rule municipality that is further narrowed by a population classification that itself is a subclass of population classification used to determine classes of city indicates that the object of the legislation was to winnow down the number of school districts so that it would apply to a very, very, very small number. While that, in and of itself, does not make the legislation violative of Article III, Section 32's prohibition against special legislation, the absence of any apparent "rhyme or reason" for the factors used indicates that they were artificial and irrelevant to remedying the situation in districts with "extraordinarily low PSSA scores."

Assuming that the 10% difference in low-test scores and that PSSA tests are meaningful, if that makes the situation so grave that an immediate takeover of the school district is necessary, there is no apparent real educational distinction to place only second class "extraordinarily failing school districts" immediately under a Board of Control and not all such "extraordinarily failing school districts." Similarly, at this stage of the proceeding, there is no apparent reason as to why it is pertinent in remedying the situation to immediately place under a Board of Control only second class school districts that are coterminous with Optional Third Class Home Rule Cities with Mayor–Council forms of government or with a population of over 45,000 when the situation would be just as grave for all students in all extraordinarily failing districts to warrant an immediate takeover.[8]

---

**8.** The Amendment also does not include other Mayor–Council Home Rule Optional Plan cities that have virtually identical governmental structures. For all intents and purposes, the Third Class City Optional Charter Law (Optional Charter Law), Act of July 15, 1957, P.L. 901, *as amended*, 53 P.S. §§ 41101–41625, has been supplanted by the Home Rule Charter and Optional Plans Law, 53 Pa.C.S. §§ 2901–3171. That Act contains three Mayor–Council optional plans (Plans A, B and C) nearly identical to the Third Class City Optional Charter Law with the Mayor–Council Plan A form of government and adopted by the same process culminating with its presentation to the electorate for its adoption. For

As to who is going to appoint the Board of Control, absent other issues, it may be rational to have a Mayor whose municipality is coterminous both with a school district to appoint the Board of Control to ensure continuing local control and increased local support for the Board of Control; but that does not explain why that concern only applies to second class school districts that are coterminous with Optional Third Class Cities with Mayor–Council forms of government that have a population of over 45,000 and not all cities or townships or home rule municipalities that are coterminous with any class of school district.

Regardless, the Commonwealth argues that the subclass of school districts created by the Amendment is valid because it is based on model educational systems in Chicago and Philadelphia. Ignoring whether it is rational to compare school districts that have populations near 4 million and 2 million, respectively, to a school district with a population of 45,000, if the creation of a "pilot program" justifies a class, any regulation could be applied to any specific city or school district by just labeling it a "pilot program" making Article III, Section 32 of the Pennsylvania Constitution meaningless. The same is true as to the contention that the General Assembly has some right to experiment under the Education Clause of the Pennsylvania Constitution allowing it to treat individual school districts differently. Both constitutional provisions were presented to the voters as a result of the Constitutional Convention of 1873 which necessarily means that nothing in the Education Clause gives the General Assembly dispensation to enact special legislation

example, the Third Class City Optional Charter Law with the Mayor–Council form of government and Optional Plan A set forth that the city or municipality shall be governed by an elected council, an elected mayor, an elected treasurer, an elected controller and any other officers that may be appointed. *Compare* Section 402 of the Optional Charter Law, *as amended,* 53 P.S. § 41402 to 53 Pa.C.S. §§ 3002. They both require that the mayor, treasurer and controller be elected by the electors to serve a term of four years. *Compare* Section 403 of the Optional Charter Law, *as amended,* 53 P.S. § 41403 to 53 Pa.C.S. § 3003. They both require that the council shall consist of five members to be elected by the electors. *Compare* Section 404 of the Optional Charter Law, 53 P.S. § 41404 to 53 Pa.C.S. § 3004. They both provide that the legislative power shall be exercised by the municipal council. *Compare* Section 407 of the Optional Charter Law, 53 P.S. § 41407 to 53 Pa.C.S. § 3006. They both provide that the executive power of the city or municipality shall be exercised by the mayor. *Compare* Section 411 of the Optional Charter Law, 53 P.S. § 41411 to 53 Pa.C.S. § 3010. Additionally, they both have almost identical language in their statutes dealing with approval of ordinances. *Compare* Section 413 of the Optional Charter Law, *as amended,* 53 P.S. § 41413 to

53 Pa.C.S. § 3012, who shall act on behalf of the mayor when the mayor is prevented to act; *compare* Section 414 of the Optional Charter Law, 53 P.S. § 41414 to 53 Pa.C.S. § 3013, maintaining a department of administration; *compare* Section 416 of the Optional Charter Law, 53 P.S. § 41416 to 53 Pa.C.S. § 3013, and budget preparation and approval; *compare* Sections 417 and 418 of the Optional Charter Law, *as amended,* 53 P.S. §§ 41417–41418 to 53 Pa.C.S. §§ 3015–3016. Home Rule Optional Plans B and C are also identical to Plan A and the Third Class City Optional Charter Law with the exception that Optional Plan A requires a director to head each department while Optional Plan B merely requires a department of administration and Plan C requires a managing director. In all other aspects, Optional Plans B and C are the same as Optional Plan A and the Third Class City Optional Charter Law. Though virtually identical with optional third class cities having the same governmental structure, for no apparent reason, those cities and school districts with these optional plans have been excluded from the class that allows the immediate takeover by a Board of Control and the appointment of the Board of Control by the mayor and gives the Board of Control taxing powers.

even as an experiment for school districts. Consequently, the Education Clause does not supercede Article III, Section 32's prohibition against special legislation.

Because no apparent reasons exist at this stage of the proceeding to establish that the criteria used in creating the punitive class are real distinctions between the local governments classified and not on artificial or irrelevant ones used for the purpose of evading Article III, Section 32, the Commonwealth's preliminary objection to Count I is overruled.

## III.

## COUNT II

## EQUAL PROTECTION

■ In Count II of its complaint, the Harrisburg School District alleges that it has been denied equal protection under the United States Constitution[9] because Act 91 singles it out for treatment different from other school districts similarly situated in that the Amendment treats the Harrisburg School District differently than it treats other similarly situated school districts by removing the people's duly elected school board from power and unilaterally inserting the Mayor and his Control Board into their positions. For the same reasons that it argues that no claim was brought under Article III, Section 32 of the Pennsylvania Constitution, the Commonwealth in its preliminary objections contends that Harrisburg School District has not pled a claim.

■ While at first glance it would appear that it is the same challenge brought under Article III, Section 32, under an equal protection analysis, the analysis is not concerned with whether the class of municipality is valid under Article III, Section 32 of the Pennsylvania Constitution but whether it is valid to treat the object of the legislation differently from how that object is treated in other classes of municipalities or school districts. In *Defazio v. Civil Service Commission of Allegheny County,* our Supreme Court addressed a similar equal protection challenge to an act that treated the sheriffs of second class counties differently than counties in other classes. It held that even if the legislation was general in nature and did not violate Article III, Section 32, under equal protection, a distinction could not be made that treated any subclass differently that bore no relationship to the general class, stating:

> Here, the Attorney General argues that the legislative classification of Allegheny County as a second class county and the unique function of the sheriff's office rest upon just such a "ground of difference" justifying the classification and the different treatment. However, the legislation in question goes beyond merely singling out Allegheny County as a class to be treated differently and in essence has effectively created a new sub-classification, that of the sheriffs of second class counties. Plainly such a sub-classification bears no relationship either to the distinction of Allegheny County as a county of the second class

9. The Equal Protection Clause of the United States Constitution is found at Section 1 of the Fourteenth Amendment and provides:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No

state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

or to any unique function of the office of county sheriff.

We find appellant's arguments to the contrary unpersuasive. While the legislature can treat different classes of counties differently, that is not what has occurred here. One particular county officer may not be treated differently from the other similar officers throughout the Commonwealth merely because that officer is within a certain class of county. The distinction created by this legislation bears no fair or reasonable relationship to the object of the legislation and bears no relationship to the distinction of Allegheny County as a county of the second class.

*Defazio,* 562 Pa. at 436-437, 756 A.2d at 1106.

Quoting *Curtis v. Kline,* 542 Pa. 249, 666 A.2d 265, 267-268 (1995), our Supreme Court then went on to explain the nature of an equal protection analysis:

The essence of the constitutional principle of equal protection under the law is that like persons in like circumstances will be treated similarly. However, it does not require that all persons under all circumstances enjoy identical protection under the law. The right to equal protection under the law does not absolutely prohibit the Commonwealth from classifying individuals for the purpose of receiving different treatment, and does not require equal treatment of people having different needs. The prohibition against treating people differently under the law does not preclude the Commonwealth from resorting to legislative classifications, provided that those classifications are reasonable rather than arbitrary and bear a reasonable relationship to the object of the legislation. In other words, a classification must rest upon some ground of difference which justifies the classification and

have a fair and substantial relationship to the object of the legislation.

*Defazio,* 562 Pa. at 436, 756 A.2d at 1106. It then concluded that there had been an equal protection violation because there was no rational basis for the sub-classification and different treatment of sheriffs of second class counties from the sheriffs of other counties or from other officers of second class counties.

Even if the Amendment establishes a rational classification of municipalities, then under *Defazio,* for it to be valid, there would still have to be a rational reason why the citizens of some extraordinarily failing school districts are not given the opportunity to create their own Improvement Plan and school board members of those school districts are divested of their duties while other school boards of extraordinary failing school districts are not. Because no apparent reason exists at this stage of the proceeding to justify treating certain extraordinarily failing school districts differently from members of other school districts similarly situated, the Commonwealth's preliminary objection to Count II is overruled.

## IV.

## COUNT III

## HOME RULE

The Harrisburg School District contends that by empowering the Mayor of a third class city to appoint a Board of Control and an Empowerment Team, the Amendment violates Article IX, Section 3 of the Pennsylvania Constitution by changing the Mayor–Council form of government adopted pursuant to the Optional Third Class City Charter Law, 53 P.S. § 35901, without the approval of the electors of Harrisburg. The Commonwealth in its preliminary objections contends that the

General Assembly can impose powers on any local official to carry out certain state-related actions and petitioners have not set forth a cause of action in this count. The question to be answered then is whether the Commonwealth has the power to give a Mayor of a third class city powers not set forth in the Optional Third Class City Charter Law (Charter Law) adopted by that city. In determining this issue, it is necessary to review the history of home rule in Pennsylvania.

When Pennsylvania initially adopted home rule in 1922, it gave the General Assembly sole discretion in determining whether to even grant home rule and to which cities. The 1922 Amendment to Art. XV, Section 1 of the Constitution of 1874 provided:

> Cities or cities of any particular class may be given the right and power to adopt their local charters and to exercise the powers and authorities of local self-governments, subject, however, to such restrictions, limitations and regulations as may be imposed by the legislature.

In the half century that the 1922 Amendment was in effect, only the City of Philadelphia was granted home rule by the General Assembly where a municipality was granted local self government under a charter that the municipality drafted. In 1957, though still reluctant to give all municipalities home rule, the General Assembly enacted a form of home rule for third class cities giving them "the right and power to adopt one of several plans of optional charters [10] and to exercise the powers and authority of local self govern-

ment." [11] To adopt an optional plan, a third-class city elects a charter commission to make a recommendation as to what form of government that particular third class city should adopt. If the charter commission makes a recommendation that an optional plan is to be adopted, that recommendation must be submitted to the voters for adoption. If adopted, the internal affairs are then governed by the form of government that is adopted as set forth in the Charter Law.

Partly because of the passage of the Charter Law and the desire of other classes of municipalities and counties for home rule, home rule became hotly debated within the 1959 Woodside Commission and the 1964 Scranton Commission, both appointed to study the need for revision of the Pennsylvania Constitution. From these Commissions came the call for the 1968 Constitutional Convention which, among other things, was to study the structure of Pennsylvania's local governments. During that time, factors that were previously militating against home rule had changed. For example, even though there still was a reluctance by the General Assembly to grant home rule, the forms of governments set forth in the Municipal Codes were insufficient to address problems of cities such as changes in population, growth, urbanization and a host of social and economic changes.[12]

To address these problems, the 1968 Constitutional Convention recommended and the voters adopted Article IX, Section

---

10. The Charter Law provides for two optional forms of government: a Mayor–Council Plan A, 53 P.S. §§ 41401–41421 and a Council Manager form of government, 53 P.S. §§ 41501–41522.

11. *See* Historical and Statutory Notes to Section 101 of the Charter Law, 53 P.S. § 41101.

12. Sources include the Reference Manuals prepared for the 1968 Constitutional Convention. *See also* Gary E. French, Home Rule in Pennsylvania, 81 Dick. L.Rev. 265 (1977).

2 of the Pennsylvania Constitution which provides:

Municipalities shall have the right and power to frame and adopt home rule charters. Adoption, amendment or repeal of a home rule charter shall be by referendum. The General Assembly shall provide the procedure by which a home rule charter may be framed and its adoption, amendment or repeal presented to the electors. If the General Assembly does not so provide, a home rule charter or a procedure for framing and presenting a home rule charter may be presented to the electors by initiative or by the governing body of the municipality. A municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time.

Unlike the 1922 Amendment, the 1968 Amendment guaranteed home rule to any municipality and removed the "power and authority of local self-government" language contained in the 1922 Amendment. The Constitutional Convention also recommended what was adopted as Article IX, Section 3 of the Pennsylvania Constitution regarding optional plans for home rule. That section provides:

Municipalities shall have the right and power to adopt optional forms of government as provided by law. The General Assembly shall provide optional forms of government for all municipalities. An optional form of government shall be presented to the electors by initiative, by the governing body of the municipality or by the General Assembly. Adoption or repeal of an optional form of government shall be by referendum.[13]

Under this section of the Constitution, the General Assembly was required to provide and cities were given the power to adopt optional plans applicable to all municipalities. In effect then, the Charter Law became one of the approved optional plans required by the Constitution.[14]

■ In this case, the City of Harrisburg adopted an optional home rule charter with a Mayor–Council form of government. *See* Mayor–Council Plan A, 53 P.S. §§ 41401–41421. Section 303 of the Charter Law, 53 P.S. § 41303, establishing the optional charter plans for third class cities, gives an optional third class city the power to "organize and regulate its internal affairs, and to establish, alter, and abolish offices, positions and employments and to define the functions, powers and duties thereof and fix their term, tenure and compensation." Nowhere in the Charter Law does that optional plan give the Commonwealth the power to delegate authority to its mayor the power to appoint a Board of Control.[15] By giving to the Mayor the

---

**13.** To ensure that the General Assembly did not thwart home rule, the Constitution provided that if the General Assembly did not authorize a form of home rule for all local governments, then the local government could decide the powers that it would have. This led to the passage of the Home Rule and Optional Plans Act.

**14.** *See* ftnt. 3 *supra.*

**15.** Section 411 of the Charter Law, 53 P.S. § 41411, provides that "the executive power of the city shall be exercised by the mayor."

In defining those terms, Section 412 of the Charter Law, 53 P.S. § 41412, provides that:

[t]he mayor shall enforce the charter and ordinances of the city and all general laws applicable thereto. He shall, annually, report to the council and the public on the work of the previous year and on the condition and requirements of the city government and shall, from time to time, make such recommendations for action by the council as he may deem in the public interest. He shall supervise all of the departments of the city government, and shall require each department to make an annual

power to appoint a Board of Control, the General Assembly attempted to give to mayors of certain optional plan third class cities something that is not in the optional plan endorsed by the citizens when it adopted the optional plan. Article IX, Section 3 of the Pennsylvania Constitution only gives to the General Assembly the power to provide for optional home rule plans that local governments can adopt through a vote of its electors. Ignoring whether the change in form would have to be submitted to the voters,[16] if the General Assembly wants to change an optional form of government to give a Mayor or council certain powers, it must change the optional form so that it governs all municipalities that have chosen that optional plan.

Because the Harrisburg School District has made out a claim for relief, the Commonwealth's preliminary objection to Count III is overruled.

## V.

## COUNT IV

## DELEGATION OF THE TAXING POWER

In its petition, the Harrisburg School District claims that the shift in power to the Board of Control, appointed by the Mayor of Harrisburg, violates Article III, Section 31 of the Pennsylvania Constitution prohibiting the General Assembly from delegating to any special commission the power to levy taxes.[17] The Commonwealth in its preliminary objection contends that in the end, the Board of Control

under the Amendment does not raise taxes because it always is done pursuant to a court order. Article III, Section 31 provides in relevant part:

> The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, *or to levy taxes or perform any municipal function whatsoever.* (Emphasis added.)

It argues that the Board of Control is a special commission and that Act 91 which amended Section 1706–B(a), 24 P.S. § 17–1706–B(a), also gives the Board of Control the powers and duties conferred by law on a special Board of Control under Sections 693, 694 and 695 of the Public School Code, 24 P.S. §§ 6–693, 6–694 and 6–695, including the taxing power the Constitution forbids. Section 693 provides that the Board of Control may require the elected school board to increase taxes; Section 694 provides that the Board of Control may levy an additional tax above and beyond the level authorized by the School Code; and Section 695 provides that the Board of Control may apply to the common pleas court to mandamus the elected school board to enact such tax or taxes or initiate proceedings to remove recalcitrant school board members for neglect of duty pursuant to Section 318 of the School Code, 24 P.S. § 3–318.

In support of its contention, the Harrisburg School District directs our attention to a case addressing the constitutionality of a non-elected school board levying tax-

---

and such other reports of its work as he may deem desirable.

**16.** 53 Pa.C.S. § 2941 provides that changes to a home rule charter or optional plan of government shall ultimately be presented to the electors.

**17.** This issue was previously addressed in our December 15, 2000 decision on the Harrisburg School District's request for injunctive relief.

es. In *Wilson v. School District of Philadelphia*, 328 Pa. 225, 195 A. 90 (1937), our Supreme Court struck down as an unconstitutional delegation an act that permitted the non-elected Philadelphia School Board to levy a tax. Explaining the rationale behind its decision, the Court stated that the delegation to municipal authorities had been recognized as lawful because it did not remove control from the people. Although school districts were agencies of the state and did not possess the governmental attributes of municipalities, the legislature had, nonetheless, given school districts the power to levy taxes for school purposes. However, because a school board was a special commission created to levy taxes, and because the act in question did not specify a maximum tax rate, the statutory provision delegating the taxing power to the non-elected school board violated the principles of our constitution, i.e., giving a legislative body chosen by the people the power to tax.

The Commonwealth, however, argues that a case more on point is *Moore v. School District of Pittsburgh*, 338 Pa. 466, 13 A.2d 29 (1940), where taxpayers sought to enjoin a tax levied by an appointed school board. Because the legislature had enacted a statute that fixed the maximum rate of tax a school board could levy, our Supreme Court held that no unconstitutional delegation occurred when the legislation fixed a maximum rate of tax that could be charged by the appointive board. Relying on *Moore*, the Commonwealth argues that as long as taxation is restricted,

it may be delegated to a non-elective board.

■ Neither case, though, is controlling because the Board of Control has the power to request that the school district levy taxes above the maximum rate set forth in the School Code, but does not give it the power to raise taxes. Section 694 of the School Code only allows the Board of Control to request the School Board to levy taxes. Assuming that mandamus will lie to compel a school board to raise taxes in the amount requested to fund education, it's the School Board that will raise the taxes, not the Board of Control. Because there is no unlawful delegation, there is no violation of Article III, Section 31 and the Commonwealth's preliminary objection to Count IV is sustained.

## VI.

### COUNT V

### REMOVAL FROM OFFICE

■ In the last count of their complaint, the Harrisburg School District claims that the Amendment violates Article VI, Section 7 of the Pennsylvania Constitution [18] because the Amendment transfers the powers of the School Board to the Board of Control, thereby removing the School Board members from office in contravention of Article VI, § 7 of the Pennsylvania Constitution. We agree with the Commonwealth's contention set forth in its preliminary objection that while the school board members' powers are affected, board members still retain their offices.

18. Article VI, Section 7 provides:

All civil officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime. Appointed civil officers, other than judges of the courts of record, may be removed at the pleasure of the power by which they shall have been appointed. All civil officers elected by the people, except the Governor, the Lieutenant Governor, members of the General Assembly and judges of the courts of record, shall be removed by the Governor for reasonable cause, after due notice and full hearing, on the address of two-thirds of the Senate.

Section 695 of the School Code was incorporated into the Amendment by reference and provides that school directors cannot even resign their positions providing:

The school directors of a distressed district may not resign their offices, except with the unanimous consent of the special board of control and shall continue in office, unless removed from office for neglect of duty ... by the court of common pleas of the county in which such district or the largest part in the area is located, or unless any of such directors are elected to another position not compatible with the position of school director or are appointed to any position for which there is a requirement that said appointee shall hold not elective office, for the remainder of their terms during the time the district is operated by the special board of control and shall perform any duties delegated to them by it. The assumption of control of a distressed school district by the special board of control shall in no way interfere with the regular election or reelection of school directors for the district.

Because the Amendment does not remove the members of the school board from office, the Commonwealth's preliminary objection to Count V is sustained.

Accordingly, based on the foregoing discussion, the Commonwealth's preliminary objections to Counts I, II and III are overruled and its preliminary objections to Counts IV and V are sustained.

### ORDER

AND NOW, this 22nd day of June, 2001, the preliminary objections filed by the Commonwealth of Pennsylvania to Counts I, II and III of the petition for review filed by the Harrisburg School District are overruled. The preliminary objection to Counts IV and V are sustained. The Commonwealth has thirty (30) days from the date of this order to file an answer.

Judge SMITH joins as to Counts I, II and III of the majority opinion and joins as to Counts IV and V in Judge KELLEY'S concurring and dissenting opinion.

KELLEY, Judge, Concurring and Dissenting.

I concur in the result reached by the majority with respect to the Commonwealth's preliminary objections to Counts I, II and III in the Harrisburg School District's petition for review. However, I disagree with the majority's resolution with respect to the Commonwealth's preliminary objections to Counts IV and V in the Harrisburg School District's petition for review.

With respect to Count IV, the majority finds that the provisions of Act 91, which amended Section 1706–B(a), 24 P.S. § 17–1706–B(a), do not violate the provisions of Article III, Section 31 of the Pennsylvania Constitution.[1] Section 1706–B(a) provides in pertinent part, "[e]xcept for the power to levy taxes, the board of control may exercise all other powers and duties conferred by law on the board of school directors and the powers and duties conferred by law on a special board of control under sections 693, 694 and 695 [of the Public School Code]..." 24 P.S. § 17–1706–B(a).

In turn. Section 693 states, in pertinent part:

power ... to levy taxes or perform any municipal function whatever..." PA. CONST. art. 3, § 31.

---

1. Article III, Section 31 states, in pertinent part, that "[t]he General Assembly shall not delegate to any special commission ... any

When the special board of control assumes control of a distressed school district, it shall have power and is hereby authorized to exercise all the rights, powers, privileges, prerogatives and duties imposed or conferred by law on the board of school directors of the distressed district, and the board of school directors shall have no power to act without the approval of the special board of control... [T]he special board of control may require the board [of school directors]:

\* \* \*

(2) To increase tax levies in such amounts and at such times as is permitted by the act to which this is an amendment...

24 P.S. § 6–693.

Finally, Section 694, 24 P.S. § 6–694, provides, in pertinent part:

When the operation of a distressed school district has been assumed by the special board of control, the board of school directors of the district shall, upon the recommendation and with the approval of the special board of control, levy an additional tax or taxes sufficient to liquidate the indebtedness of the district... [N]otwithstanding present limitations on tax rates imposed by law, such limitations shall not apply to distressed school districts.

Thus, although the foregoing provisions purport to exclude the power to levy taxes from a board of special control, they also confer upon the board of special control the power to compel the board of school directors to levy taxes, and they remove the statutory limitations on tax rates that may be imposed. Such provisions, which vest the board of special control with the discretion to impose or increase a tax, and the authority to compel its imposition or increase, clearly run afoul of Article III, Section 31. *See Wilson v. School District of Philadelphia*, 328 Pa. 225, 241–242, 195 A. 90, 99 (1937) ("[T]he main purpose of Article III, Section [31], was to correct the recognized economic mistake of taking the fiscal power away from the regular, legislative body and putting it in the hands of an appointive commission, organized for special purposes and not subject to the control of the people. Here the effect of the delegation by the General Assembly is to vest in the school board the unlimited power of increasing expenses, plus the right to levy a tax in an amount sufficient to cover the expenditures to be incurred. The Constitution prohibits this, and this court must give effect to the mandate of its framers.") (citing *Tranter v. Allegheny County Authority*, 316 Pa. 65, 173 A. 289 (1934).). *Cf. Warren v. Ridge*, 762 A.2d 1126 (Pa.Cmwlth.2000).

With respect to Count V, the majority finds that the provisions of Section 1706–B(a), incorporating Sections 694 and 695 of the Public School Code, do not violate the provisions of Article VI, Section 7 of the Pennsylvania Constitution.[2] As noted

---

**2.** Article VI, Section 7 provides, in pertinent part, that "[a]ll civil officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime..." PA. CONST. art. 6, § 7. This provision applies to the instant elected members of the board of school directors. *See, e.g., In re Petition to Recall Reese*, 542 Pa. 114, 123, 665 A.2d 1162, 1166–1167 (1995) ("[I]t must be remembered that school directors were elected public officers ... when the Constitution was adopted. *In the absence of the existence of a system, necessarily in the minds of the framers, it would be held that they came within the express terms of article VI, section [7], and that any act subsequently passed, providing a conflicting method of removal, was legally prohibited.* But we must remember that the earlier legislation furnished a different manner of procedure in such cases, and it, or modifying acts of assem-

above, Section 1706–B(a) provides in pertinent part, that "[e]xcept for the power to levy taxes, the board of control may exercise all other powers and duties conferred by law on the board of school directors and the powers and duties conferred by law on a special board of control under sections 693, 694 and 695 [of the Public School Code]..." 24 P.S. § 17–1706–B(a).

Section 693 provides, in pertinent part, that "[w]hen the special board of control assumes control of a distressed school district, it shall have power and is hereby authorized to exercise all the rights, powers, privileges, prerogatives and duties imposed or conferred by law on the board of school directors of the distressed district, and the board of school directors shall have no power to act without the approval of the special board of control..." 24 P.S. § 6–693.

Section 694 provides, in pertinent part, that "[w]hen the operation of a distressed school district has been assumed by the special board of control, the board of school directors of the district shall, upon the recommendation and with the approval of the special board of control, levy an additional tax or taxes sufficient to liquidate the indebtedness of the district..." 24 P.S. § 6–694. Finally, Section 695 provides, in pertinent part, that "[t]he school directors of a distressed district may not resign their offices, except with the unanimous consent of the special board of control and shall..." 24 P.S. § 6–695.

Thus, under the foregoing provisions, the powers of the board of school directors have been transferred to the special board of control, the board of school directors only has the authority to act as directed by the special board of control, and the members of the board of school directors are prohibited from resigning their offices. Such a statutory scheme transferring the powers of the board of school directors, making that body impotent to act except at the express direction of the special board of control, and imposing upon the board of school directors a condition of *"involuntary servitude"*, clearly constitutes an impermissible "removal from office"[3] under the provisions of Article VI, Section 7 of the Pennsylvania Constitution. *See, e.g., Commonwealth ex rel. Kelly v. Marinelli,* 330 Pa. 82, 198 A. 623 (1938); *Commonwealth ex rel. Kelley v. Clark,* 327 Pa. 181, 193 A. 634 (1937); *Commonwealth ex rel. Smillie v. McElwee,* 327 Pa. 148, 193 A. 628 (1937).

Accordingly, unlike the majority, I would overrule the Commonwealth's preliminary objections to Counts I, II, III, IV and V in the Harrisburg School District's petition for review.

LEADBETTER, Judge, Dissenting.

As the majority notes, our Supreme Court has recently stated:

The right to equal protection under the law does not absolutely prohibit the Commonwealth from classifying individuals for the purpose of receiving different treatment, and does not require equal treatment of people having different needs. The prohibition against treating people differently under the law does not preclude the Commonwealth from resorting to legislative classifications, provided that those classifications are reasonable rather than arbitrary and

---

bly passed since 1873, will still be effective, *unless an attempt is made to depart from the provisions as then existing."* [*Georges Township School Directors,* 286 Pa. 129, 135, 133 A. 223, 225 (1926) ] (emphasis added).").

**3.** *See, e.g.,* William Shakespeare, *Romeo and Juliet,* act II, sc. ii, ("What's in a name? that which we call a rose/By any other name would smell as sweet.").

bear a reasonable relationship to the object of the legislation.

*DeFazio v. Civil Service Comm'n,* 562 Pa. 431, 436, 756 A.2d 1103, 1106 (2000).

Moreover:

[T]he underlying purpose of [Pa. Constitution Art. 3, § 32] is analogous to the equal protection clause of the federal constitution and [ ] our analysis and interpretation of the clause should be guided by the same principles that apply in interpretation of federal equal protection.

*Id.* at 436, 756 A.2d at 1105.

Applying these principles to the case at hand, I find no denial of equal protection, and thus no violation of Article III, § 32. It is beyond dispute that the General Assembly enacted the Education Empowerment Act in response to a significant pattern of failure among many of the Commonwealth's public schools. The challenged provision of the EEA, the Act 91 Amendment, provides a specialized remedy for the Harrisburg School District which is specifically tailored both to the educational problems of the district and to the particular form of government of the City and the district. It is modeled after programs in other states which have shown promising results, and is frankly designated as a pilot program.

Because I believe Act 91 represents a rational legislative response to a serious erosion of our consistency in providing "a thorough and efficient system of public education to serve the needs of the Commonwealth," Pa Const., Art. III, § 14, I would sustain the preliminary objections to Counts I and II. Further, I agree with respondents that, "Pa. Const. art. IX, § 3, by its own terms, only requires voter referendum when an optional form of government is adopted or repealed.... The provision thus speaks only to a wholesale change of municipal government, not to amendments of municipal powers which may be made from time to time by the General Assembly." Therefore, I would also sustain the preliminary objections to Count III. Accordingly, I respectfully dissent from that portion of the majority's decision overruling those preliminary objections.