Charlie L. WARREN, II, in his own right, and as parent and natural guardian of Albert Warren, a minor; Portia L. West, in her own right and as parent and natural guardian of Portia N. West, a minor; Corinne M. Anderson, in her own right and as parent and natural guardian of Corelle Anderson, a minor; Joseph Williams, in his own right and as parent and natural guardian of Najah George, a minor; Rev. Alfonso Sherald; Sara Ferguson; Rueben Guy; Leola Williams, Petitioners,

v.

Thomas J. RIDGE, Governor of the Commonwealth of Pennsylvania; Eugene W. Hickok, Secretary of Education of the Commonwealth of Pennsylvania, Respondents.

Commonwealth Court of Pennsylvania.

Argued Sept. 13, 2000.
Decided Nov. 13, 2000.

Lynne L. Wilson, Harrisburg, for petitioners.

Ann G. St. Ledger, Harrisburg, for respondents.

Before DOYLE, President Judge, COLINS, Judge, McGINLEY, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, KELLEY, Judge and FLAHERTY, Judge.

PELLEGRINI, Judge.

Before this Court are preliminary objections in the nature of a demurrer filed by Thomas J. Ridge, Governor of the Commonwealth of Pennsylvania and Eugene W. Hickok, Secretary of Education of the Commonwealth of Pennsylvania (collectively, the Commonwealth) in response to a petition for review in the nature of a complaint in equity and for declaratory judgment filed by the petitioners in the above-captioned action who are taxpayers, teachers and parents of students in the Chester Upland School District, Delaware County (collectively, Chester Upland Objectors) challenging the constitutionality of the Education Empowerment Act, Act No. 2000–16 (Act 16) and specifically Section 1705–B(h)(3) of Act 16 dealing with the Chester Upland School District.

## I.

The Education Empowerment Act (EEA), which was enacted on May 10, 2000, authorizes the Secretary of Education to place the control of a school district in a Board of Control where the school district has a history of low test scores. The EEA provides that the Secretary of Education is to establish an "Education Empowerment List." Section 1703–

B of the School Code.[1] School districts that meet the statutory definition of a "history of low test performance" are placed on the list. The affected districts are to be notified of their placement on the list, and the list itself is published in the Pennsylvania Bulletin. After notification, the following occurs:

1) The Department of Education (the Department) establishes an Academic Advisory Team for each affected District;

2) The affected District establishes a School District Empowerment Team to work with the Academic Advisory Team to develop an Improvement Plan, which is submitted to the Department;

3) The Department reviews the Plan, and may either approve it or request modifications; and

4) The Board of Directors of the affected District "shall implement" the approved plan, notwithstanding any other provision of law to the contrary.

In the event that the affected District does not meet the goals established in the plan within three years, pursuant to Section 1705–B, the District is declared an "Education Empowerment District," and the Secretary may grant an additional year within which the District can meet the Plan's goals. Once declared an Education Empowerment District, it is placed under a Board of Control consisting of the Secretary of Education or his designee and two residents of a county in which the affected District is located who are appointed by

the Secretary. The Board of Control assumes all powers and duties conferred by law on the Board of School Directors with the exception of the power to levy taxes. Section 1706–B. When an affected District has met the goals in its improvement plan and no longer has a history of low test performance, control is restored to the Board of School Directors. Section 1710–B.

There are two school districts that are admittedly treated differently from the way other districts are that are designated as an "Education Empowerment District." [2] In this case, only Section 1705–B(h)(3) of Act 16 is at issue. That section creates a classification of school districts with a history of low test performance that have been certified as distressed for a minimum period of two years under Sections 691 and 692 of the Public School Code[3] on the effective date of the Act. Under Sections 691 and 692, when a district has been certified as "financially distressed" by the Secretary of Education, it is placed under a "special board of control" consisting of the Secretary of Education and two citizens appointed by the common pleas court or by the Secretary, in the event that the court fails to act. The "special board" assumes control of the affairs of the district and operates it in place of the school board until a sound financial structure is re-established. The Chester Upland School District was found to be financially distressed in June 1992 and for the past eight years has been under the control of a special board.

---

**1.** The EEA is contained in Section 8.1 of Act 16. All citations in this opinion will be to the added sections of the School Code contained in Section 8.1 of Act 16.

**2.** The other provision dealt with the "Reed Amendment" whereby school districts that had a history of low test performance were placed under the control of a Board of Control, entirely devoid of state supervision or input and controlled by the mayor of a specific city of the third class rather than the affected district. The Harrisburg School District was the only district that fell within that provision. A separate action is currently pending

at 266 M.D.2000 challenging the constitutionality of that legislation. *See Harrisburg School District v. Commonwealth*, 762 A.2d 398 (Pa.Cmwlth.2000.)

**3.** *Added by* the Act of December 15, 1959, P.L. 1842, *as amended*, 24 P.S. §§ 6–691 and 6–692. It appears that a separate act passed on November 30, 1959, added two entirely different sections numbered as 691 and 692. As a result, there are two of each section currently in the Public School Code. The sections at issue here are the "second" sections bearing these numbers.

## II.

As a result of the enactment of the EEA, the Chester Upland Objectors filed its petition for review seeking to have Section 1705–B(h)(3) declared unconstitutional so that the Chester Upland School District would not immediately be placed under a Board of Control without the opportunity to appoint a local team to provide input on the improvement plan, and without three years within which to improve test scores and meet the goals of that plan. They argued that once effectuated, Section 1705–B(h)(3) would violate both the United States and Pennsylvania Constitutions by violating its right to equal protection. They also sought to have that section declared unconstitutional under Article III, Section 32; Article IX, Section 1; and Article III, Section 31 of the Pennsylvania Constitution.

Specifically, the Chester Upland Objectors asserted in their petition the following five counts:

- **Count 1—Violation of Article III, Section 32 of the Pennsylvania Constitution.** Section 1705–B(h) creates a special class of one school district, the Chester Upland School District, in violation of Article III, Section 32 which prohibits the General Assembly from passing a local or special law regulating school districts.

- **Count II—Violation of Article IX, Section 1 of the Pennsylvania Constitution.** The Chester Upland School District's status as financially distressed is not a reasonable justification for differential treatment in violation of Article IX, Section 1 which requires that general laws be uniform as to all classes of local government.

- **Count III—Violation of Article III, Section 31 of the Pennsylvania Con-** stitution. Section 1706–B of the EEA unconstitutionally delegates power to the Empowerment Board of Control by providing it with all powers of the elected school board, including the power to incur debt in violation of Article III, Section 31.

- **Count IV—Violation of Equal Protection Guarantees under the Pennsylvania Constitution.** The Chester Upland School District is treated differently from all other school districts, including the Duquesne Borough School District that have lower tests scores than the students of the Chester Upland School District. Singling out the Chester Upland School District is not related to a legitimate state interest, is irrational and violates the equal protection guarantee of the Pennsylvania Constitution.

- **Count V—Violation of Equal Protection Guarantees under the United States Constitution.** Section 1705–B(h) creates an unconstitutional classification by providing that a school district be immediately certified as an Education Empowerment District if it has a history of low test performance and is certified as distressed for two years. Immediate designation of the Chester Upland School District as an Education Empowerment District treats similarly situated districts differently—the Duquesne Borough School District has lower test scores than the Chester Upland School District yet it has not been immediately placed under an Empowerment Board of Control.

In response to the petition for review, the Commonwealth has filed preliminary objections[4] arguing that the

---

4. When considering preliminary objections in the nature of a demurrer, our scope of review is to determine whether on the facts alleged, the law states with certainty that no recovery is possible. *Rouse & Associates–Ship Road Land Limited Partnership v. Pennsylvania Environmental Quality Board,* 164 Pa.Cmwlth. 326, 642 A.2d 642 (1994). In ruling on preliminary objections, the Court must consider the evidence in the light most favorable to the non-moving party, i.e., the Chester Upland Objectors. *Derman v. Wilair Services, Inc.,* 529 Pa. 621, 600 A.2d 537 (1991). If the grant of preliminary objections will result in

Chester Upland Objectors' petition fails to state a claim upon which relief may be granted for Counts I through V, and that this Court lacks jurisdiction over Count III because the issue is not ripe for review.

## III.

### A. COUNT I

### SPECIAL LEGISLATION

■ The Commonwealth contends that the Chester Upland Objectors have failed to state a claim upon which relief may be granted in Count I of its petition claiming that Act 16 does not violate Article III, Section 32 because it is not special legislation.[5] Article III, Section 32 of the Pennsylvania Constitution provides:

> The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law.
>
> 1. Regulating the affairs of counties, cities, townships, wards, boroughs, *or school districts.* (Emphasis added.)
>
> * * *
>
> Nor shall the General Assembly indirectly enact any special or local law by the party repeal of a general law; but laws repealing local or special acts may be passed.

The Commonwealth contends that Act 16 does not constitute special or local law as the concept is meant in Article III, Section 32. Rather, it argues:

the dismissal of the case, the objection should be sustained only if it is clear and free from doubt. *Zinc Corporation of America v. Department of Environmental Resources,* 145 Pa. Cmwlth. 363, 603 A.2d 288 (1992), *aff'd,* 533 Pa. 319, 623 A.2d 321 (1993).

5. The Commonwealth also argues that Governor Ridge is not a proper party to this action because his only participation involved signing the legislation. While the Chester Upland Objectors contend that he is a proper party because he participated in the signing of the

Act 16 is not a special or local bill in the constitutional sense. Although it has a local effect on some school districts, the Act in its entirety deals with education matters affecting the entire Commonwealth. The provisions of Act 16 which constitute the EEA have, for the most part, state-wide applicability, though presently only a small number of schools may take advantage of most provisions. A small part of the Act applies only to the Chester–Upland School District and will likely never apply to any other community. However, the Chester–Upland School District presents a unique situation requiring unique treatment.

As recognized by Taxpayers, at the time Act 16 was enacted, Chester–Upland was a distressed school district governed by a three-person appointed Board of Control. That Board, once established, exercised all of the rights and powers of the elected School Board and, but for Act 16, would have remained in control until a sound financial structure was re-established in the School District. In addition to its distressed status, Chester–Upland was one of only eleven school districts in Pennsylvania whose students had a failure rate of fifty percent or greater on the PSSA test for reading and math. Worse, the district was one of only three with a failure rate of more than two-thirds. Of all of the school districts listed in Taxpayer's Appendix B as academically distressed, Chester–Upland is the only one which is also financially distressed. This combination of problems plainly sets Chester–

EEA and has a continuing role in implementing the law as the EEA provides for school improvement grants that depend on his performance as they relate to developing an annual budget, neither the act of signing legislation nor the development of an annual budge violates any rights. The true party in interest is the government official who implements the law. *See City of Pittsburgh v. Commonwealth,* 112 Pa.Cmwlth. 188, 535 A.2d 680 (1987).

Upland apart from any other school district in Pennsylvania.

(Commonwealth's brief at 9–10.)

In a separate case challenging another provision of this EAA as special legislation, *Harrisburg School District*, we set forth in great detail the history of the adoption of Article III, Section 32 and explained its purpose as ending the "flood of privileged legislation for particular localities and for private purposes which was common in 1873." *Id.* at 405. We summarized the current state of the law as allowing the General Assembly to establish classifications without violating Article III, Section 32 but only those that did not create a closed class and were based on real distinctions between the local government classified and not on artificial or irrelevant ones used for the purpose of evading constitutional prohibition. *Id.* at 407. We also rejected the Commonwealth's argument that otherwise special legislation is not special legislation if contained in a much larger bill applicable to all school districts because such a holding would make Article III, Section 32's prohibition against special legislation meaningless.

In this case, the Chester–Upland Objectors do not challenge the authority of the legislature to classify school districts based on low test scores or the authority to classify school districts based on insolvency. They argue that Act 16's designation of districts that have been "financially distressed" for more than two years as of July 1, 2000, effectively creates a closed class consisting only of the Chester–Upland School District, and, therefore, is impermissible. While the authority of the legislature to classify school districts based on low test scores may be rational, Section 1705–B(h)(3) treats one specific district in an entirely different manner and applies to a class that is logically and factually limited to one. Accordingly, Section 1705–B(h)(3) creates a class of one that is merely illusory, and, therefore, does not meet the threshold determination of a "genuine class." Because it is not a genuine class and there is a strong likelihood that in the permanent injunction proceeding this provision will be declared unconstitutional, the Chester–Upland Objectors have stated a claim upon which relief may be granted.

Because Section 1705–B(h)(3) violates Article III, Section 32 of the Pennsylvania Constitution, the Commonwealth's preliminary objection to Count I is denied.[6]

## B. COUNT II—VIOLATION OF ARTICLE IX, SECTION 1 OF THE PENNSYLVANIA CONSTITUTION[7]

The Commonwealth contends that Count II of the petition for review claiming that Article IX, Section 1 of the Constitution essentially raises that the same issues and should be analyzed in the same manner as the Chester–Upland Objectors' claims that Section 1705–B(h)(3) violates Article II, Section 32 of the Pennsylvania Constitution on its equal protection claims. For the same reasons we denied the Commonwealth's preliminary objection to those counts, we will deny its preliminary objection to this count.

---

6. Previously, the Chester Upland Objectors filed a request for preliminary injunctive relief to preliminarily enjoin Section 1705–B(h)(3). In that action, the Commonwealth argued that even if the class was impermissible, any constitutional infirmity could be cured by simply striking the language that rendered the class closed, i.e., the language limiting its application to districts that had been financially distressed for more than two years *on the effective date of the act*. The Chester Upland Objectors agreed that if that language did not appear in the act, Section 1705–B(h)(3) would not constitute special leg-

islation. Based on the outcome of that action, we did not reach that issue. We note that Commonwealth did not raise that issue in its preliminary objections.

7. Article IX, Section 1 of the Pennsylvania Constitution provides:

The General Assembly shall provide by general law for local government within the Commonwealth. Such general law shall be uniform as to all classes of local government regarding procedural matters.

## C. COUNT III—VIOLATION OF ARTICLE III, SECTION 31 OF THE PENNSYLVANIA CONSTITUTION

■ The Chester Upland Objectors contend that the EEA violates Article III, Section 31 of the Pennsylvania Constitution by delegating power to a Board of Control in a manner that separates the power to tax from the power to spend. Article III, Section 31 provides:

> The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatsoever.

The Commonwealth contends that the EEA does not violate Article III, Section 31 because the General Assembly specifically excluded the levying of taxes from the powers of the Board of Control.[8]

Section 1706–B(a) of the EEA provides: "*Except for the power to levy taxes,* the board of control may exercise all other powers and duties conferred by law on the board of school directors." 24 P.S. § 17–1706–B(a). (Emphasis added.) Because the Board of Control does not have the authority to levy taxes, there is no violation of Article III, Section 31 and the Commonwealth's preliminary objection to Count III is granted.

8. The Commonwealth also argues that this issue is not ripe for review. Because the Chester Upland Objectors have pled in their petition that the Chester Upland School District is currently being treated differently than other school districts, that argument is rejected.

9. The Equal Protection Clause of the Pennsylvania Constitution is found at Article I, Section 26 and provides:
Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right.

## D. COUNT IV—VIOLATION OF EQUAL PROTECTION GUARANTEE UNDER PENNSYLVANIA CONSTITUTION

## COUNT V—VIOLATION OF EQUAL PROTECTION GUARANTEE UNDER UNITED STATES CONSTITUTION

■ In Counts IV and V respectively of its complaint, the Chester Upland Objectors allege that they have been denied equal protection under the Pennsylvania and United States Constitutions[9] because Section 1705–B(h)(3) singles the Chester Upland School District out for different treatment from other school districts on the Educational Empowerment List based solely on its financially distressed status and does not provide any reason for such unique treatment.

In *Harrisburg School District v. Commonwealth,* we addressed the identical issue as it related to the Commonwealth's treatment of the Harrisburg School District in applying the Reed Amendment that provided the Mayor of Harrisburg with control over that District based on its low test scores. We cited *Defazio v. Civil Service Commission of Allegheny County,* 562 Pa. 431, 756 A.2d 1103 (2000), where our Supreme Court held that even if the legislation was general in nature and did not violate Article III, Section 32, under equal protection, a subclass could not be created that treated any subclass differently that bore no relationship to the gen-

The Equal Protection Clause of the United States Constitution is found at Section 1 of the Fourteenth Amendment and provides:
All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

eral class. Based on that holding, we determined that because the Harrisburg School District had been singled out, there had been a denial of equal protection. Similarly, in this case, because it has been alleged that the Chester Upland School District has been singled out, there has been a denial of equal protection here as well. Therefore, the Commonwealth's preliminary objection to Counts IV and V are denied. Based on the same reasoning, the Commonwealth's preliminary objection to Count II is also denied.

Accordingly, the Commonwealth's preliminary objection to Count III is granted and its preliminary objections to Counts I, II, IV and V are denied.

### ORDER

AND NOW, this 13th day of November, 2000, the preliminary objection filed by the Commonwealth of Pennsylvania to Count III of the petition for review filed by the Chester Upland School District is granted. Its preliminary objections to Counts I, II, IV and V are denied.

The Commonwealth has thirty (30) days from the date of this order to file an answer.

COLLINS, Judge, concurring and dissenting.

I concur in the majority's dismissal of Count III of the complaint filed by the Chester Upland Objectors. I would also dismiss Counts I, II, IV, and V; therefore, I dissent to the majority opinion insofar as it denies the Commonwealth's preliminary objections to those counts.

I disagree with the majority's conclusion that Act 16 constitutes special legislation in violation Article III, Section 32 of the Pennsylvania Constitution. Act 16 is not legislation for a particular locality or for a private purpose; rather, it was written to address a problem that affects school districts statewide and it applies to all school districts. One small part of Act 16, creates a classification for school districts with a history of low test scores that have been certified as financially distressed for at least two years under the Public School Code; however, the combination of long-standing financial distress and a history of low student test scores amply justify the legislature's special treatment of Chester Upland School District. The Chester Upland School District has distinguished itself as among the most in need of the potential benefits of immediate application of Act 16's educational empowerment reforms, and the scope of the School District's financial distress and financial mismanagement is well documented.

Similarly, equal protection principles do not prohibit the Commonwealth from classifying school districts for the purpose of receiving different treatment and does not require equal treatment of school districts having different needs. *Defazio v. Civil Service Commission,* 562 Pa. 431, 436, 756 A.2d 1103, 1106 (2000) (quoting *Curtis v. Kline,* 542 Pa. 249, 666 A.2d 265, 267–68 (1995)). As I have stated, I believe that Act 16's classification of Chester Upland for special treatment is a reasonable classification, and the classification has a fair and substantial relationship to the object of the legislation; i.e., local education empowerment with the objective of educational reform and increasing students' test scores.

In Act 16, the General Assembly has addressed the threat to the Commonwealth posed by low student test scores. Within that framework, it has acknowledged that the threat has become a long-standing reality in the Chester Upland School District and the problems of this particular School District could not be worse. For these reasons, I would dismiss the Objectors' complaint in its entirety.