Joanne M. ALAICA, Hope L. Fuller, Larry A. Jackson, Catherine V. Vaccaro, Cynthia Goffman, Deborah A. Marshall, Richard P. Livingston, Linda L. Kavish, Thomas Knaus, Roger Kostley, Richard W. Askey, Joyce Brackbill, Mary Furhman, Susan

---

Grimm McCoy, Tracey R. Weller, Sayre G. Turney, Kendra V. Hoffman, Lenni J. Elhajj, Mary Ann Clouser, Howard Duerr, Robert Homer, Paul J. Urbani, Michael L. Evans, Barbara Ann Bell, Janice Elerby, Donna Howard, Janice A. Laird, Jeanne Becker Walton, and Andrew Martin, Petitioners,

v.

Thomas J. RIDGE, Governor of the Commonwealth of Pennsylvania, and Eugene W. Hickok, Secretary of Education of the Commonwealth of Pennsylvania, Respondents.

Commonwealth Court of Pennsylvania.

Argued April 4, 2001.

Decided Oct. 9, 2001.

William A. Hebe, Wellsboro, for petitioners.

Daniel J. Doyle, Harrisburg, for respondents.

Linda J. Shorey, Harrisburg, for intervenors, Senator Jubelirer and Speaker Ryan.

Wayne Wynn, Philadelphia, for intervenors, Phila. Federation of Teachers, et al.

Before DOYLE, President Judge, COLINS, McGINLEY, SMITH, PELLEGRINI, KELLEY and LEADBETTER, JJ.

LEADBETTER, Judge.

A group of teachers, parents and taxpayers filed the present petition for review, in our original jurisdiction, challenging the constitutionality of the Act of May 10, 2000, P.L. 44, No. 16, 24 P.S. §§ 17–1701–B through 17–1716–B, known as the Education Empowerment Act, which amended the Public School Code.[1] Before this court are the preliminary objections filed by Respondents, Governor Thomas J. Ridge and Secretary of Education Eugene W. Hickok, and by Intervenors, Senator Jubelirer and Speaker Ryan (collectively the Commonwealth parties).

In *Warren v. Ridge,* 762 A.2d 1126 (Pa. Cmwlth.2000), we summarized the operation of the EEA as follows:

The Education Empowerment Act ... authorizes the Secretary of Education to place the control of a school district in a Board of Control where the school district has a history of low test scores.... School districts that meet the statutory definition of a "history of low-test performance" are placed on the ["Education Empowerment List"]. The affected districts are to be notified of their placement on the list, and the list itself is published in the Pennsylvania Bulletin. After notification, the following occurs:

1) The Department of Education (the Department) establishes an Academic Advisory Team for each affected District;

2) The affected District establishes a School District Empowerment Team to work with the Academic Advisory Team to develop an Improvement Plan, which is submitted to the Department;

3) The Department reviews the Plan, and may either approve it or request modifications; and

4) The Board of Directors of the affected District "shall implement" the approved plan, notwithstanding any other provision of law to the contrary.

In the event that the affected District does not meet the goals established in the plan within three years, pursuant to Section 1705–B, the District is declared an "Education Empowerment District," and the Secretary may grant an additional year within which the District can meet the Plan's goals. Once declared an Education Empowerment District, it is placed under a Board of Control consisting of the Secretary of Education or his designee and two residents of a county in which the affected District is located who are appointed by the Secretary. The Board of Control assumes all powers and duties conferred by law on the Board of School Directors with the exception of the power to levy taxes.

---

1. Act of March 10, 1949, P.L. 30, *as amended,* 43 P.S. §§ 1–101—27–2702.

When an affected District has met the goals in its improvement plan and no longer has a history of low-test performance, control is restored to the Board of School Directors.

*Id.* at 1127–28.

Plaintiffs are from public school districts that have been identified as having a history of low-test performance. Based on a two-year average of scores on the Pennsylvania System of State Assessment Tests (PSSA Test) in math and reading, more than 50% of district students scored in the bottom quartile.[2] Under the EEA, these districts must establish an Empowerment Team to work with the Academic Advisory Team appointed by the Department of Education to develop an Improvement Plan. Section 1704–B of the EEA, directs that the board of school directors shall implement the Improvement Plan and consistent therewith may: establish a charter school; designate a school in the district as "independent" and thereby grant operational control to an independent governing body established by the board of school directors; employ professional staff in accordance with Section 1724–A of the Charter School Law; contract with individuals or organizations to operate a school; reconstitute a school; reassign, suspend or dismiss a professional employee; supervise and direct principals, teachers and administrators; rescind the contract of the superintendent and other administrative personnel; and, reallocate resources, amend school procedures, and develop plans for educational achievement, testing and evaluation. 24 P.S. § 1704–B(a).

In their petition for review, plaintiffs set forth in eleven counts their challenges to the constitutionality of the EEA and to the placement of their districts on the empowerment list. In summary, they claim:

In **counts 1 through 4,** that the EEA violates the equal protection guarantee of the Pennsylvania Constitution, Article I, § 26 and, in **count 8,** that it violates the Fourteenth Amendment to the United States Constitution. Plaintiffs contend that the EEA creates a class of teachers, parents and taxpayers whose rights may be abrogated if certain school district improvement measures authorized under the EEA are implemented. They allege that the class is not rationally related to education improvement because it is based on student performance on the PSSA test, which is not a suitable test to identify districts in need of the education improvement measures authorized by the EEA.

In **count 5,** that the EEA violates the prohibition against impairment of contracts in Article I, § 17 of the Pennsylvania Constitution and, in **count 9,** that it violates the similar prohibition in Article 1, § 10 of the United States Constitution by subjecting tenured teachers to possible dismissal, suspension, reassignment or demotion in abrogation of an employment contract arising under provisions of the School Code;

In **count 6,** that the EEA violates the prohibition against delegating a special power to tax in Article III, § 31 of the Pennsylvania Constitution by conferring on an appointed Board of Control the spending power of the elected school board

---

2. The EEA defines "History of low test performance" as, "A combined average of fifty per centum or more of students scoring in the bottom measured group of twenty-five per centum or below basic level of performance on the Pennsylvania system of school assessment tests under 22 Pa.Code Ch. 4 (relating to academic standards and assessment) in math and reading in the most recent two school years for which scores are available." 24 P.S. § 17–1702–B.

and thereby indirectly conferring power to tax;

In **count 7,** that the EEA was enacted in violation of Article III, §§ 1, 2 and 4 by amending the Bill so as to change its original purpose, failing to refer the amended Bill to committee, and consider it on three separate days on the floor of either congressional house;[3]

In **count 10,** that the plaintiffs' school districts have been improperly placed on the empowerment list because the listings are based on PSSA Tests that were flawed in design, and six of the districts did not fall within the parameters defining low performance districts;[4] and,

In **count 11,** that the violations of plaintiffs' rights under the Fourteenth Amendment and the Contracts Clause of the United States Constitution establish a cause of action under 42 U.S.C. § 1983.

Governor Ridge and Secretary of Education Hickok filed preliminary objections: to counts one through six, eight, nine and eleven for lack of ripeness; to count seven for non-justiciability under the Enrolled Bill Doctrine; to count ten for lack of standing; and demurring to all counts. Similarly, Senator Jubelirer and Speaker Ryan filed preliminary objections: to counts one through six and eight through eleven for lack of ripeness and for failure to exhaust administrative remedies before the Department of Education; to count seven for non-justiciability; to all counts for lack of standing; and demurring to all counts.

## I. Ripeness

### A. Constitutional claims: Counts One through Five, Eight, Nine and Eleven

It is well established that "[d]eclaratory judgments are not obtainable as a matter of right. Rather, whether a court should exercise jurisdiction over a declaratory judgment proceeding is a matter of sound judicial discretion." *Pa. State Lodge v. Dep't of Labor and Indus.,* 692 A.2d 609, 613 (Pa.Cmwlth.1997) (citation

---

**3.** In *Harrisburg School District v. Hickok,* 762 A.2d 398 (Pa.Cmwlth.2000), we took judicial notice of the legislative history of Senate Bill 652 as set forth on the website of the Pennsylvania Senate. *Id.* at 401, n. 1. Based on the website information we described the process of enactment as follows:

On March 24, 1999, Senate Bill 652 (SB652) was introduced and was titled, "An Act Amending the act of March 10, 1949, P.L. 30" (the Public School Code of 1949, 24 P.S. §§ 1–101—27–2703), but only proposed to amend one specific section of the School Code and to add a new section authorizing vocational-training schools to establish capital reserves. Following a number of amendments not relevant here, on June 8, 1999, the bill was passed by the Senate. After additional amendments, again not relevant here, on June 16, 1999, the bill was passed by the House of Representatives. The bill was then returned to the Senate and referred to the Committee on Rules and Executive Nominations.

On May 2, 2000, the bill was reported from the Senate Rules Committee with further amendments and again passed by the Senate. In the House, the bill was referred to the House Rules Committee, which inserted substantial material into the bill. This material added a new article to the School Code entitled the "Education Empowerment Act" (EEA). The title of the bill was amended to reflect the inclusion of these provisions. On May 3, 2000, the House passed the amended bill, and on the same day, the Senate concurred and the bill was sent to the Governor who signed it on May 10, 2000.

762 A.2d at 400–01.

**4.** The six school districts alleged to have been placed on the empowerment list based on improper calculations are: Aliquippa, Sto–Rox, York City, Clairton, Lancaster and Steelton–Highspire.

omitted). A substantial limitation [5] on the exercise of such jurisdiction is that we will not adjudicate a petition for declaratory judgment where the issues are not ripe for determination. In deciding whether the doctrine of ripeness bars our consideration of a declaratory judgment action, both the state and federal courts employ a two part test, to wit: "[t]he court must consider whether the issues are adequately developed for judicial review and what hardship the parties will suffer if review is delayed." *Treski v. Kemper Nat'l Ins. Cos.*, 449 Pa.Super. 620, 674 A.2d 1106, 1113 (1996) [*citing Rouse & Assoc. v. Envtl. Quality Bd.*, 164 Pa.Cmwlth. 326, 642 A.2d 642, 645 (1994)].

The first prong of the test—whether the issues are adequately developed for judicial review—itself implicates two concepts relevant here. The first is whether the asserted deprivation of rights (or entitlement to relief) is immediate or is hypothetical and contingent upon uncertain future events.

> Only where there is a real controversy may a party obtain a declaratory judgment. . . . A declaratory judgment must not be employed to determine rights in anticipation of events which may never occur or for consideration of moot cases or as a medium for the rendition of an advisory opinion which may prove to be purely academic.

*Gulnac v. South Butler School District*, 526 Pa. 483, 487, 587 A.2d 699, 701 (1991). *See also Ruszin v. Dep't of Labor & In-*

dus., *Bureau of Workers' Comp.*, 675 A.2d 366, 371 (Pa.Cmwlth.1996). Indeed, it has been stated that, "A substantial contingency is the classic impediment to a preenforcement challenge [to a new statute]." *Artway v. Attorney Gen. of N.J.*, 81 F.3d 1235, 1248 (3d Cir.1996). A second concept implicated within the question of the court's ability to adequately review the issues is whether resolution of the constitutional or other legal dispute will involve substantial factfinding. Obviously, the more fact intensive the dispute, the more significant the obstacle posed by the uncertainty of future events. As the Supreme Court has explained:

> [T]he reason of postponing decision until a constitutional issue is more clearly focused by, and receives the impact from, occurrence in particular circumstances is precisely that those circumstances may reveal relevancies that abstract, prospective supposition may not see or adequately assess.

*Communist Party of the United States v. Subversive Activities Control Bd.*, 367 U.S. 1, 78, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).

The second prong of the ripeness test recognizes that even where the case is not as fully developed for judicial review as the court would find appropriate, it may still address the merits if refusal to do so would work a demonstrable hardship on the parties. This could occur, for instance, if a new statute provided criminal sanctions for conduct which was believed to be

---

**5.** It is not altogether clear whether the ripeness doctrine represents a prudential limitation or a jurisdictional bar. Although the weighing of factors and the nature of the factors to be weighed to determine the ripeness issue would seem to militate in favor of the former view, our court has held to the contrary. *Brown v. Liquor Control Bd.*, 673 A.2d 21, 23–24 (Pa.Cmwlth.1996). But compare *Pa. Dental Hygienists' Assoc. v. Board of Dentistry*, 672 A.2d 414, 416 (Pa.Cmwlth.

1996). The federal courts have noted a similar ambiguity. *Philadelphia Fed'n of Teachers v. Ridge*, 150 F.3d 319, 323 n. 3 (3d Cir.1998); *Taylor Inv., Ltd. v. Upper Darby Twp.*, 983 F.2d 1285, 1289 (3d Cir.1993) and cases cited therein; *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 411 n. 12 (3d Cir.1992). However, whether we lack jurisdiction over an unripe claim or simply will refuse to exercise it is of no practical significance to our disposition of this case.

constitutionally protected speech. In that case, a preenforcement challenge might be heard so that the plaintiffs would not be put to the Hobson's choice of risking incarceration as the price of testing the law. *See, e.g., United States v. Loy,* 237 F.3d 251, 257 (3d Cir.2001).

The ripeness test was succinctly summarized in *Philadelphia Federation of Teachers v. Ridge,* 150 F.3d 319 (3d Cir.1998), as follows:

> A court should look to (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." Under the "fitness for review" inquiry, a court considers whether the issues presented are purely legal, as opposed to factual, and the degree to which the challenged action is final. The various factors that enter into a court's assessment of fitness include: whether the claim involves uncertain and contingent events that may *not occur as anticipated or at all;* the extent to which a claim is bound up in the facts; and whether the parties to the action are sufficiently adverse.
>
> The second prong focuses on the hardship that may entail in denying judicial review, and the determination whether any such hardship is cognizable turns on whether the challenged action creates a "direct and immediate" dilemma for the parties, such that the lack of pre-enforcement review will put the parties to costly choices. (citations omitted).

*Id.* at 323. Applying this test, we must conclude that most of plaintiffs' claims are unripe.

In counts one through five, eight, nine and eleven, plaintiffs seek a pre-enforcement declaration that the EEA is unconstitutional. They contend that when their respective school districts were placed on the empowerment list, or in the case of the Chester–Upland School District, certified as an empowerment district, they "lost statutory rights they had previously possessed." Even allowing, for the sake of discussion, that plaintiffs have identified constitutionally protected rights, these rights will be affected only if several contingencies occur. Plaintiffs' action is premised upon the possibility that having been placed on the empowerment list, one or more of the districts may devise, and obtain Department approval of a "school district improvement plan," under which teachers *might* be reassigned, suspended or dismissed and/or schools *might* be converted to charter schools. In addition, the goals in the plan *might not* be achieved in the prescribed time and a Board of Control *might* then be established. Plaintiffs speculate further that if a Board of Control is established, that Board *might* reassign, suspend or dismiss teachers, usurp the power of the elected school board, levy school taxes, and create charter schools. That is to say, plaintiffs challenge the constitutionality of the EEA based on what might happen in their districts, not what necessarily will happen or what has happened. The mere possibility that a district may take any of the measures of which plaintiffs complain does not present a sufficiently concrete case in which to conduct an inquiry into the constitutionality of the legislation.

Moreover, even those allegations which do not involve future contingencies, such as the claim that the PSSA tests are flawed, are fact specific—as are virtually all of plaintiffs' claims. Any inquiry into particular plans which might in the future impact upon particular contracts will involve facts which vary widely from district to district. Because plaintiffs' constitutional claims are both fact intensive and premised on events that may never occur, those claims are not at present "fit for judicial review."

As to the second prong of the ripeness test, plaintiffs do not aver and we cannot discern that they will be put to costly choices if they are denied pre-enforcement review. The present plaintiffs are certainly not confronted with the dilemma of either refraining from constitutionally protected activity or risking prosecution. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). At present, plaintiffs risk nothing by continuing in their current personal and professional endeavors. If the circumstances and events plaintiffs anticipate actually do occur, then adequate avenues in equity or law exist to protect rights and compensate harm.

The circumstances here are not unlike those described in *Cherry v. Philadelphia*, 547 Pa. 679, 685, 692 A.2d 1082, 1085 (1997), wherein our Supreme Court concluded:

> This Court need not reach the constitutional issue raised by appellant because his claim is not justiciable. Because appellant filed his declaratory judgment action before the City took any steps to assess or collect taxes or enforce the license provision, there is no actual controversy. Appellant has not suffered any damage nor is there an actual potential for damage as a result of the City's letter to him notifying him of his violations. Where no actual controversy exists, a claim is not justiciable and a declaratory judgment action cannot be maintained.

*Id.* at 685, 692 A.2d at 1085. Accordingly, the preliminary objections to counts one through five and counts eight, nine and eleven for lack of ripeness are sustained.

### B. Placement on Empowerment List—Count Ten

■ Similarly, in count ten, plaintiffs challenge the placement of their districts on the empowerment list but cannot aver how this event adversely affects them. Specifically, plaintiffs claim that the school districts were improperly placed on the empowerment list based on tests administered prior to July 2000. They contend that these tests did not include a science component and so did not meet the definition of "PSSA test" established in Section 102 of the School Code, as amended 77 P.S. § 1–102(6). In addition, plaintiffs assert that six of the school districts were improperly placed on the list based upon an improper calculation as to the percentage of students who scored in the bottom quartile. Plaintiffs do not aver and we are unaware of any harm that flows from mere placement of their school districts on the empowerment list. The only immediate consequence of the listing is that the districts must establish an empowerment team that will work cooperatively with the Department's advisory team to prepare an education improvement plan. 24 P.S. § 17–1703–B. Preparation of such a plan does not at all adversely impact the plaintiffs. Plaintiffs cannot identify any actual controversy arising from the placement of their school districts on the empowerment list. For the same reasons stated above with regard to the constitutional claims, the preliminary objection to count ten is sustained.

### II. Demurrer—Counts Six and Seven

■ In count six of their complaint, plaintiffs assert that the EEA, in particular Section 1706–B, violates Article III, Section 31 of the Pennsylvania Constitution by delegating a spending power to the Board of Control. Plaintiffs contend that this delegation violates the Constitution because it either indirectly confers a taxing power on the appointed Board of Control or separates the power to tax, which must reside with elected officials, from the power to spend, which the EEA delegates

to the appointed Board. This claim was asserted by taxpayers, teachers and parents of students in the Chester Upland School District in *Warren v. Ridge*, 762 A.2d 1126 (Pa.Cmwlth.2000) and rejected by this court. *See also Harrisburg Sch. Dist. v. Hickok*, 781 A.2d 221, 232–33 (Pa. Cmwlth.2001).

Similarly, in count seven of their complaint, plaintiffs assert that in the process of enacting the EEA, the legislature violated Article III, Sections 1, 2 and 4 of the Pennsylvania Constitution. The Commonwealth parties assert in their preliminary objections that pursuant to our holding in *Harrisburg School District v. Hickok*, 762 A.2d 398 (Pa.Cmwlth.2000), this count must be dismissed as non-justiciable under the Enrolled Bill Doctrine. In *Harrisburg School District*, an en banc panel of our court rejected the same challenge to the process by which the legislature enacted the EEA that present plaintiffs assert. Because we have already decided these issues as a matter of law, the demurrers to counts six and seven are sustained.

Accordingly, having sustained the preliminary objections to all counts, we dismiss the petition for review.

Judge SMITH concurs in the result only.

### *ORDER*

AND NOW, this 9th day of October, 2001, the Preliminary Objections by Respondents, Thomas J. Ridge, Governor, and Eugene W. Hickok, Secretary of Education, and by Intervenors, Senators Jubelirer and Ryan, are hereby sustained in accordance with the foregoing opinion.

The Petition for Review in the nature of a complaint for declaratory judgment and equitable relief is hereby dismissed.

Concurring and Dissenting Opinion by Judge KELLEY

I agree with the result reached by the majority with respect to the Commonwealth parties' preliminary objections to Counts 1 through 5, 8, and 9 through 11 in the plaintiffs' petition for review. In addition, I concur in the result reached by the majority with respect to the Commonwealth parties' preliminary objections to Count 7 in the plaintiffs' petition for review based on the reasoning outlined in my concurring and dissenting opinion in *Harrisburg School District v. Hickok*, 762 A.2d 398 (Pa.Cmwlth.2000) (Concurring and Dissenting Opinion by Kelley, J.).

However, I disagree with the majority's resolution with respect to the Commonwealth parties' preliminary objections to Count 6 in the plaintiffs' petition for review based on the reasoning outlined in my concurring and dissenting opinion in *Harrisburg School District v. Hickok*, 781 A.2d 221 (Pa.Cmwlth.2001) (Concurring and Dissenting Opinion by Kelley, J.). As a result, unlike the majority, I would overrule the Commonwealth parties' preliminary objections to Count 6 in the plaintiffs' petition for review.