828 A.2d 1079

HARRISBURG SCHOOL DISTRICT, Harrisburg School Board, Joseph C. Brown, Linda M. Cammack, Kenneth Leister, Judith C. Hill, Wanda R.D. Williams, individually, and as parent and natural guardian of Rauwshan Williams, Ricardo A. Davis, individually and as parent and natural guardian of Jeremiah Stephenson and Tiffany Davis, Clarice Chambers, Joy Ford, individually and as parent and natural guardian of Samantha Wilson, Grace Bryant, Glenise Cobb–Wingfield, individually, and as parent and natural guardian of Johnathan Wingfield and Asia Wingfield, and Citizens Concerned for Children First, by Dwayne Blount and Dale Carter, Trustees Ad Litem

v.

Charles B. ZOGBY, Secretary of Education, Commonwealth of Pennsylvania, Stephen R. Reed, Mayor of Harrisburg, Jane/John Doe I, Jane/John Doe II, Jane/John Doe III, Jane/John Doe IV, Jane/John Doe V, Potential Members of the Board of Control for the Harrisburg School District.

Appeals of Charles B. ZOGBY, Secretary of the Pennsylvania Department of Education @1MAP2002; Board of Control of the Harrisburg School District @2MAP2002 and 12MAP2002; Stephen R. Reed, Mayor of Harrisburg @7MAP2002 and 14MAP2002.

Supreme Court of Pennsylvania.

Argued April 8, 2003.

Decided July 22, 2003.

John G. Knorr, Daniel J. Doyle, Harrisburg, for Charles B. Zogby.

Linda J. Shorey, Julia Marie Glencer, John P. Krill, for Presiding Officers of the General Assembly of the Com. of PA, Appellant Amicus Curiae.

David Fredrick Russey, Charles B. Gibbons, Pittsburgh, Thomas Peter Brogan, Harrisburg, for Stephen R. Reed.

Nathan Harlan Waters, for Potential Members of the Board of Control for the Harrisburg School District.

Royce Leon Morris, Steven Edward Grubb, David M. Steckel, Ronald M. Katzman, Harrisburg, for Harrisburg School District et al., Appellees.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION

JUSTICE SAYLOR.

This is a direct appeal from an order of the Commonwealth Court invalidating an amendment to Pennsylvania's Educational Empowerment Act which would allow the mayors of certain medium-sized cities within the Commonwealth to assume control of failing school districts. The primary issue presented is whether the amendment in question constitutes special legislation in violation of Article III, Section 32 of the Pennsylvania Constitution.

## I.

In May of 2000, the General Assembly enacted the Education Empowerment Act (the "EEA").[1] The act establishes an Education Empowerment List (the "List") to be maintained by the Department of Education (the "Department"). Pursuant to the terms of the statute, the Department must place any school district having a history of low test performance on the List.[2] After the Department thus "lists" a school district, it notifies the district of its status and establishes an "academic advisory team" for the district. The district, for its part, appoints an "empowerment team" to work with the Department's academic advisory team in developing a school district improvement plan which sets forth specific "methods and goals" for improving the performance of each underperforming school within the district. The plan is then submitted to the Department for modification and approval. *See* 24 P.S. § 17–1703–B. In implementing the plan, the school board may, *inter alia*, replace district administrative personnel (including the superintendent), establish charter schools or privately-run schools, permit schools to operate under independent governance, employ professional staff within schools, and reallocate resources within the district. Thereafter, the school board must submit to the Department annual reports including a list of all contracts entered into by the board and any other implementation data as required by Department guidelines. *See* 24 P.S. §§ 17–1704–B, 17–1708–B.

If the school district improves sufficiently, such that it reaches the goals in the improvement plan and no longer has a history of low test performance, the Department removes it from the List and returns control to the school board. *See* 24 P.S. § 17–1710–B. If, however, the school district fails to meet its goals for educational improvement and maintains a

---

1. Act of May 10, 2000, P.L. 44, No. 16, § 8.1 (as amended, 24 P.S. §§ 17–1701–B—17–1716–B).

2. A "history of low test performance" arises whenever 50% or more of the students within the district receive failing reading and math scores on state standardized tests for two consecutive years. *See* 24 P.S. § 17–1702–B (definitions).

history of low test performance for three years, the Common-wealth assumes control of the district. The Department certi-fies it as an "education empowerment district" and establishes a three-member board of control to govern it.[3] The board of control is comprised of the Secretary of Education (the "Sec-retary") or the Secretary's designee, as chairman, as well as two residents of the county where the school district is locat-ed, who are appointed by the Secretary and serve at his or her pleasure. *See* 24 P.S. § 17–1705–B. The board of control develops a revised improvement plan and submits it to the Department for amendment and approval. Except for the power to levy taxes, the board of control may exercise all other powers that were previously exercised by the school board—including those set forth above pursuant to Section 17–1704–B—and is additionally authorized to close a school within the district. Once the school district no longer has a history of low test performance and meets its revised improve-ment plan goals, it is decertified and authority reverts to the local school board. *See* 24 P.S. § 17–1706–B.

Under the EEA, failing urban school districts that meet certain criteria are subjected to an expedited recovery plan whereby the Secretary waives the inclusion of the school district on the List and immediately certifies it as an empow-erment district. In these cases, the mayor of the city in which the district is located, rather than the Secretary, appoints the board of control. This mayor-selected board consists of five members of the community who serve at the mayor's pleasure, and exercises essentially the same powers as a board of control appointed by the Secretary. The mayor also appoints a school district empowerment team to develop a district improvement plan, which is ultimately submitted to the De-partment for modification and approval. A district certified under this special provision is governed by the mayor's board of control for at least five years. Thereafter, when it no

---

**3.** The Department may allow the district to remain on the List for a fourth school year prior to certifying it if the Department determines that the additional year will enable the school district to improve its performance and meet the goals set forth in the improvement plan. *See* 24 P.S. § 17–1705–B(a).

longer has a history of low test performance and reaches the goals contained in the improvement plan, it is decertified and authority reverts to the local school board. *See* 24 P.S. § 17-1707–B(b).

The General Assembly codified the following legislative findings in support of this expedited scheme:

(1) In addition to the operation of failing school districts by a state, other jurisdictions across the nation are utilizing other models to reform failing urban school districts in which the chief executive of the city government is empowered to control the governance of the public schools serving the city. For example, Chicago has implemented a reform model operated by the mayor.

(2) In this Commonwealth, the Mayor of the City of Philadelphia, a city of the first class coterminous with a school district of the first class, recently was empowered by amendments to the home rule charter immediately to appoint all members of the Board of Education of the School District of Philadelphia to serve at his pleasure. In no other school district of the Commonwealth is the mayor or chief executive of a municipality empowered to control or affect the governance of school districts. Under the home rule charter amendments, the Mayor of Philadelphia will have significant input into development and implementation of any school district improvement plan adopted under [24 P.S. § 17-1703–B] and the school district generally.

(3) In order to assess the effectiveness of a mayor-led system of school governance in other large city school districts in this Commonwealth which have a history of extraordinarily low test performance, a pilot program under this section shall be established for certain school districts. . . .

24 P.S. § 17-1707–B(a).

As noted, only a certain, defined class of urban school districts is eligible for the expedited, mayor-led program described above. Under the original version of the EEA, a school district was eligible for such treatment only if it was "a

school district of the second class with a history of low test performance which is coterminous with the city of the third class which contains the permanent seat of government." Due to the permanent-seat-of-government criterion, this class could only consist of a single member, the Harrisburg School District. For this reason, the qualifying language was commonly referred to as the "Reed Amendment" after Harrisburg's mayor, the Honorable Stephen R. Reed. Shortly after passage of the EEA, the Commonwealth Court concluded that the Reed Amendment was unconstitutional special legislation as defined by Article III, Section 32 of the Pennsylvania Constitution, and preliminarily enjoined its implementation. This Court affirmed the Commonwealth Court's order and declared the Reed Amendment invalid as violative of Section 32.[4] *See Harrisburg Sch. Dist. v. Hickok (Hickok I)*, 563 Pa. 391, 398, 761 A.2d 1132, 1136 (2000).

One week before this Court's *Hickok I* decision was announced, the General Assembly amended Section 1707–B, 24 P.S. § 17–1707–B, in an apparent response to the Commonwealth Court's preliminary injunction order. *See* Act of Nov. 22, 2000, P.L. 672, No. 91, § 9 ("Act 91"). Act 91 altered the Reed Amendment so that the class of school districts eligible for mayoral control is now defined as follows:

For a school district of the second class which has a history of extraordinarily low test performance, which is coterminous with a city of the third class that has opted under the "Optional Third Class City Charter Law" or 53 Pa.C.S. Pt. III Subpt. E to be governed by a mayor-council form of government and which has a population in excess of forty-five thousand (45,000), the secretary shall waive the inclusion of the school district on the education empowerment list under [24 P.S. § 17–1703–B(a)] and immediately certify

4. In relevant part, Section 32 provides:
 The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law:
 1. Regulating the affairs of counties, cities, townships, wards, boroughs or school districts[.]
 PA CONST. art. III, § 32.

the school district as an education empowerment district. No school district shall be certified under this section later than December 31, 2005.

24 P.S. § 17–1707–B(a.1).[5] This provision, which applies to the Harrisburg School District, is the subject of the present appeal.

On December 4, 2000, the Harrisburg School District, the Harrisburg School Board, several individuals residing within the Harrisburg School District, and "Citizens Concerned for Children First," an unincorporated association of such residents (collectively, "Appellees"), filed a petition for review in the nature of a complaint in equity and declaratory judgment in the Commonwealth Court, challenging the constitutionality of Act 91.[6] They also requested special relief in the nature of a preliminary injunction. The named respondents were Pennsylvania Secretary of Education Eugene W. Hickock, Mayor Reed of Harrisburg, and five John/Jane Doe's, representing the potential members of the board of control for the Harrisburg School District (collectively, "Appellants").[7] Appellees alleged in their complaint that, like the Reed Amendment, Act 91 constitutes special legislation and violates federal equal protection principles, and that it additionally impermissibly changes the form of government of the City of Harrisburg. They admitted that the class created by Act 91 is open to more than one member—and named the Erie School District as another potential member—but asserted that it "was drafted without regard for any rational, meaningful criteria of classification." They also averred that the shift in power to the board of control in effect: delegates tax-levying power to a special commission in contravention of Article II, Section 31 of the state Constitution; and removes the school board mem-

5. A "history of extraordinarily low test performance" is essentially the same as a history of low test performance, *see supra* note 2, except that the school district must have a two-year failure rate of 60% instead of 50%. *See* 24 P.S. § 17–1702–B.

6. The Harrisburg School District and the Harrisburg School Board withdrew from the case in December of 2001.

7. The present Secretary of Education, Charles B. Zogby, was later substituted for former Secretary Hickock as a respondent.

bers from office in violation of Article VI, Section 7 of the state Constitution. In opposing the application for special relief, the Secretary maintained, *inter alia*, that, in addition to Harrisburg, the school districts of Erie, Reading, and York are eligible for inclusion within the classification created by Act 91.

After the Commonwealth Court denied preliminary injunctive relief, Appellants filed preliminary objections, which the Commonwealth Court sustained with respect to Counts IV and V, finding that the school board retained tax-levying power and that its members retained their offices although their powers were affected. The court overruled the preliminary objections, however, as to Counts I, II, and III, that is, the counts alleging that the amendment amounts to unconstitutional special legislation, violates the Equal Protection Clause, and improperly changes the form of Harrisburg's government. *See Harrisburg Sch. Dist. v. Hickok ("Hickok II")*, 781 A.2d 221 (Pa.Cmwlth.2001) (*en banc*). In so ruling, the court found that, with respect to the special legislation claim, no apparent reason existed "at this stage in the proceeding" for the criteria used in creating the class, and that such criteria appeared to be designed to avoid the special legislation prohibition. *See id.* at 230. In this regard, the court indicated:

The number and oddness of the distinctions that mix and match a class of school with a particular subclass of a third class city that itself is a particular subclass of a home rule municipality that is further narrowed by a population classification that itself is a subclass of population classification used to determine classes of city indicates that the object of the legislation was to winnow down the number of school districts so that it would apply to a very, very, very small number. While that, in and of itself, does not make the legislation violative of Article III, Section 32's prohibition against special legislation, the absence of any apparent "rhyme or reason" for the factors used indicates that they were artificial and irrelevant to remedying the situation in

districts with "extraordinarily low [Pennsylvania System of State Assessment] scores."

*Id.* at 228.

Concerning the equal protection challenge, the Commonwealth Court concluded that there was no "rational reason why the citizens of some extraordinarily failing school districts are not [sic] given the opportunity to create their own Improvement Plan and school board members of those school districts are divested of their duties while other school boards of extraordinary [sic] failing school districts are not." *Id.* at 231. Finally, with regard to the change in the form of Harrisburg's government, the court noted that Harrisburg had adopted a home rule charter with a mayor-council form of government pursuant to Article IX, Section 3 of the Pennsylvania Constitution, which permits municipalities to choose optional forms of government subject to approval by the electorate,[8] and the Optional Third Class City Charter Law (the "Charter Law"),[9] which prescribes the powers of an optional charter plan for a city of the third class. The Charter Law, however, does not specify that the mayor may appoint a board of control. The court thus reasoned that if the General Assembly wishes to change the form of government to give a mayor or council more powers, it must modify the optional form of government provided by the Pennsylvania Constitution and the Charter Law so that it governs all municipalities that have chosen that optional plan. *See Hickok II,* 781 A.2d at 234. In other words, according to the Commonwealth Court, the General Assembly may not afford mayors of third

---

**8.** Section 3 states:

Municipalities shall have the right and power to adopt optional forms of government as provided by law. The General Assembly shall provide optional forms of government for all municipalities. An optional form of government shall be presented to the electors by initiative, by the governing body of the municipality, or by the General Assembly. Adoption or repeal of an optional form of government shall be by referendum.

PA. CONST. art. IX, § 3.

**9.** Act of July 15, 1957, P.L. 901 (as amended, 53 P.S. §§ 41101–41625).

class cities powers that are not enumerated in the optional plan that was selected by the city's voters. *See id.* at 233–34.

Judge Leadbetter dissented and indicated that she would have sustained Appellants' preliminary objections as to all counts of the complaint. Initially, she observed that a separate constitutional provision, Article III, § 14, affirmatively requires the Legislature to provide a "thorough and efficient system of public education" for the Commonwealth. In this respect, she indicated that "the General Assembly enacted the EEA in response to a significant pattern of failure among the Commonwealth's public schools," and opined that Act 91—which is specifically designated as a pilot program and modeled after proven programs from other states—provides a remedy for the Harrisburg School District that is closely tailored to the form of government employed by the city and its public school system. Therefore, she concluded that the act represents a "rational legislative response" to the high rate of educational failure in the Commonwealth, and accordingly, violates neither Article III, Section 32 of the state Constitution nor the Equal Protection Clause. As for the claim that Act 91 impermissibly alters the city's form of government, Judge Leadbetter agreed with Appellants' argument that Article IX, Section 3 "speaks only to a wholesale change of municipal government, not to amendments of municipal powers which may be made from time to time by the General Assembly." *Hickok II,* 781 A.2d at 239 (Leadbetter, J., dissenting) (internal quotation marks omitted).[10]

Appellees subsequently moved for judgment on the pleadings against the Secretary, raising the three issues on which implementation of Act 91 had been preliminarily enjoined, namely, that the statute violates Article III, Section 32 and the Equal Protection Clause, and that it violates Article IX, Section 3 by granting powers to the mayor of Harrisburg

10. Judge Kelley concurred in the result, but, in an opinion joined by Judge Smith, dissented from the sustaining of the Commonwealth's preliminary objections to the counts involving the delegation of taxing power and the removal of the existing school board from office. *See id.* at 237–38 (Kelley, J., concurring and dissenting). Those counts are not at issue in this appeal.

absent approval of Harrisburg's voters. Appellants filed answers with new matter, asserting that the class is open to more than one member and that several unresolved factual issues remained, and requested an opportunity to present expert testimony concerning the reasonableness of the classification drawn by Act 91.

On January 3, 2002, the Commonwealth Court granted Appellees' motion, stating that it had "fully explored each and every one of these arguments in our prior decision regarding the preliminary objections and our answers remain the same." *Harrisburg Sch. Dist. v. Zogby*, 789 A.2d 797, 801 (Pa.Cmwlth. 2002) (*en banc*). Thus, based upon its earlier reasoning, the court declared Act 91 unconstitutional and permanently enjoined the Commonwealth from "carrying out or acting in any way pursuant to" Section 1707–B, 24 P.S. § 17–1707–B. In so doing, the court rejected the Secretary's contention that the motion should be denied pending resolution of asserted issues of fact, stating that the motion only presented a question of law as to whether Act 91 was special legislation, regardless of the reasonableness of the classification created. *See id.* at 802 n. 5. Judge Leadbetter dissented without opinion.[11]

Appellants argue that the purpose of Act 91 is to explore ways to "fix broken school districts," specifically urban ones, and that it extends to school districts in medium-sized cities a tool already available in Philadelphia, the Commonwealth's largest city: putting the school district under the control of a board appointed by the mayor. They contend that Act 91 therefore represents a rational response to the problem of failing urban school districts, and state further that it cannot constitute special legislation because the classification it cre-

11. The court also "voided" the Secretary of Education's certification of the Harrisburg School District as an Education Empowerment District. However, the Secretary's appeal operated as an automatic supersedeas of the January 3, 2002, order. *See* Pa.R.A.P. 1736(b). Appellees' request to vacate the supersedeas was denied.

Additionally, although the January 3, 2002, order did not technically resolve Appellees' claims against the Mayor or the Board of Control, the Commonwealth Court subsequently declared its order final, *see* Pa. R.A.P. 341(c), after which the Mayor and Board of Control filed notices of appeal.

ates may contain multiple school districts. In particular, they aver that if the school districts of the cities of Erie, Allentown, and Reading perform poorly enough, they will be subject to immediate certification as empowerment districts under Act 91. Appellants also assert that, contrary to the Commonwealth Court's statement that there was no "rhyme or reason" to the set of qualifiers contained in the definition of the class at issue, the General Assembly could reasonably have arrived at that particular classification. Specifically, they posit that the General Assembly could rationally have opted to: treat urban school districts differently from rural ones; establish a "pilot program" for a relatively small number of cities in an effort to assess the results before making immediate certification more widely available to other cities; and include within the eligible class only municipalities in which there is a single executive official (i.e., a mayor) who is directly accountable to the same local electorate which makes up the school district. Finally, Appellants argue that the act does not effect any change in the "form" of a city government within the meaning of Article IX, Section 3, because it does not alter the governmental structure of any city—that is, it does not change the manner in which any municipal official is elected or shift power from one branch of government to another. In this regard, Appellants submit that the Charter Law does not purport to provide an exhaustive list of mayoral duties, and that statutes authorizing a mayor to serve on, or appoint members to, commissions or agencies are commonplace in Pennsylvania.

Amici, the Honorable Robert C. Jubelirer, President *pro tempore* of the Pennsylvania Senate, and the late Honorable Matthew J. Ryan,[12] add that the burden of proof in a facial challenge to the constitutionality of a statute rests upon the challengers, and the Commonwealth Court erroneously shifted such burden to Appellants to prove that the statute was valid. They argue that Appellees failed to meet their burden to

12. Mr. Ryan was Speaker of the Pennsylvania House of Representatives at the time he and Senator Jubelirer filed their amicus brief. He continued in that office until his death on March 29, 2003.

prove that there was no rational basis upon which the Legislature could have chosen to classify school districts along the lines established by Act 91.

Appellees respond there can be no rational reason to treat some third-class cities differently than others. They contend, moreover, that the disputed classification is in reality aimed only at Harrisburg, and that it therefore constitutes special legislation regardless of any asserted rational basis, and unfairly stigmatizes the Harrisburg School District as being the "worst in Pennsylvania." Appellees state further that there is no "pilot program" exception to Article III, Section 32's proscription on special legislation, as otherwise the Reed Amendment would have been upheld. Finally, Appellees submit that the "form" of government, for purposes of Article IX, Section 3, includes the duties of governmental officials, and that, accordingly, giving Harrisburg's mayor additional powers violates Section 3 and additionally alters to the type of city government selected by Harrisburg voters and runs contrary to the Public School Code's mandate that elected school boards, and not local governmental officials, govern public schools within the Commonwealth.

## II.

A statute duly enacted by the General Assembly is presumed valid and will not be declared unconstitutional unless it "clearly, palpably and plainly violates the Constitution." *Purple Orchid, Inc. v. Pennsylvania State Police*, 572 Pa. 171, 178, 813 A.2d 801, 805 (2002). The party seeking to overcome the presumption of validity bears a heavy burden of persuasion. *See Commonwealth, Dep't of Transp. v. McCafferty*, 563 Pa. 146, 155, 758 A.2d 1155, 1160 (2000). Our examination and interpretation of the statute, on this facial challenge, is undertaken with due regard to the codified legislative findings set forth above. *See Leventhal v. City of Phila.*, 518 Pa. 233, 246, 542 A.2d 1328, 1335 (1988) (indicating that codified legislative findings are entitled to "great weight" in deciding whether an enactment violates the Constitution). As the present matter involves a question of law, our review is plenary. *See Penn-*

*sylvania Sch. Bds. Ass'n, Inc. v. Commonwealth Ass'n of Sch. Adm'rs.,* 569 Pa. 436, 442, 805 A.2d 476, 479 (2002).

## A. Special Legislation and Equal Protection

In the seven years before the Constitution of 1874 was adopted, the General Assembly enacted 8,755 local or special acts and only 475 general laws. *See* Robert E. Woodside, PENNSYLVANIA CONSTITUTIONAL LAW 321 (1985).[13] Against this backdrop, the citizens of Pennsylvania chose to include within the Constitution of 1874 a proscription on special laws "for a very simple and understandable purpose-to put an end to the flood of privileged legislation for particular localities and for private purposes which was common in 1873.... It was aimed at laws that were in the proper sense local and special." *Haverford Township v. Siegle,* 346 Pa. 1, 6, 28 A.2d 786, 789 (1942) (citation omitted). Thus, the underlying purpose of Section 32's prohibition on special legislation was not so much to prohibit the General Assembly from undertaking limited, remedial measures as part of a long-term strategy to fulfill its duties connected with the public interest, but to end the practice of favoritism.

 Over the years, this prohibition, as well as other state constitutional provisions such as the Uniformity Clause, *see* PA. CONST. art. XIII, § 1 (prescribing uniformity in taxation), have been understood to include principles of equal protection under the law. *See Tool Sales & Serv. Co. v. Commonwealth,* 536 Pa. 10, 26, 637 A.2d 607, 615 (1993); *Leventhal,* 518 Pa. at 239, 542 A.2d at 1331. Indeed, it is now generally accepted that the meaning and purpose of the Equal Protection Clause of the United States Constitution, *see* U.S. CONST. amend. XIV, § 1, and the state Constitution's prohibition against special laws, *see* PA. CONST. art. III, § 32, are sufficiently similar to

---

**13.** *See also* Gary E. French, *Home Rule in Pennsylvania,* 81 DICK. L.REV. 265, 267 n. 20 (1977) ("Special legislation is that which affects exclusively a specifically named municipality. In Pennsylvania [during the post-Civil War period], the General Assembly was so occupied with dispensing special favors that there was little time left to deal with problems of state-wide concern." (citation omitted)).

warrant like treatment, and that contentions concerning the two provisions may be reviewed simultaneously. *See DeFazio v. Civil Serv. Comm'n of Allegheny County*, 562 Pa. 431, 436, 756 A.2d 1103, 1105 (2000); *Laudenberger v. Port Auth. of Allegheny County*, 496 Pa. 52, 67 n. 13, 436 A.2d 147, 155 n. 13 (1981). In particular, Article III, Section 32 and the Equal Protection Clause both reflect the principle that like persons in like circumstances must be treated similarly. *See Commonwealth v. Albert*, 563 Pa. 133, 138, 758 A.2d 1149, 1151 (2000).

 Equal protection principles do not, however, vitiate the Legislature's power to classify, which necessarily flows from its general power to enact regulations for the health, safety, and welfare of the community. *See Harris v. State Bd. of Optometrical Exam'rs.*, 287 Pa. 531, 538, 135 A. 237, 240 (1926). Nor do they prohibit differential treatment of persons having different needs, *see Curtis v. Kline*, 542 Pa. 249, 255, 666 A.2d 265, 267 (1995), provided the classifications at issue bear a reasonable relationship to a legitimate state purpose. *See Tosto v. Pennsylvania Nursing Home Loan Agency*, 460 Pa. 1, 14, 331 A.2d 198, 204 (1975); *Baltimore & Ohio R.R. Co. v. Commonwealth, Dep't of Labor and Indus.*, 461 Pa. 68, 83, 334 A.2d 636, 643 (1975).[14] In this regard, a classification, though discriminatory, will be deemed reasonable if any state of facts reasonably can be conceived to sustain it. *See Curtis*, 542 Pa. at 255, 666 A.2d at 268. However, a classification will be struck down if it is based upon artificial or irrelevant distinctions used for the purpose of evading the constitutional prohibition. *See Hickok I*, 563 Pa. at 397, 761 A.2d at 1136 (citing *Freezer Storage, Inc. v. Armstrong Cork Co.*, 476 Pa. 270, 275, 382 A.2d 715, 718 (1978)). In undertaking its analysis, a reviewing court is free to hypothesize reasons the

**14.** Appellees claim that education is a fundamental right, and that the Court should therefore apply a standard that is more stringent than the "rational basis" test. We need not resolve here the parties' dispute concerning whether education is a fundamental right for purposes of equal protection analysis, since Appellees do not argue, nor does it appear from the record, that Act 91 infringes anyone's ability to receive an education.

138

Legislature might have had for the classification. *See id.; see also Baltimore & Ohio R.R.*, 461 Pa. at 84, 334 A.2d at 644 (hypothesizing reasons that the Legislature could have determined that railroad employees had a greater need for mandatory weekly payment than employees of other common carriers); *Geary v. Retirement Bd. of Allegheny County*, 426 Pa. 254, 259–60, 231 A.2d 743, 746 (1967) (suggesting reasons that the Legislature could have determined that police officers were more in need of early retirement than other county employees).

■ The history of the present dispute, as related above, leaves little doubt that the General Assembly sought initially to prescribe an aggressive course of action to ameliorate the systemically failing school district located in the state capital. Under this procedure, the school district would be immediately certified as an empowerment district and placed under the mayor's control rather than having to wait three years and then being taken over by the state. Although this effort may have been salutary in purpose and effect, this Court held in *Hickok I* that the General Assembly could not, consistent with Article III, Section 32 and the Equal Protection Clause, prescribe such strong measures for Harrisburg only. Thus, the General Assembly sought to cure the defect identified by the *Hickok I* Court by extending immediate certification and mayoral control to other cities. Recognizing, however, that these measures were to some degree experimental in nature, the General Assembly apparently sought, as well, to limit the number of municipalities affected by the new provision by extending the class only to a small group of other medium-sized cities which were, in its view, similarly situated to Harrisburg. This group consists of cities that have opted for a mayor-council form of government under the Charter Law, have a population between 45,000 and 250,000, and have a mayor who is accountable to the same electorate as that which makes up the school district.[15]

15. Although Act 91 specifies that the city must be a city of the third class which is coterminous with a school district of the second class, it should be noted that a school district of the second class by definition

We note initially that the Legislature is permitted to treat cities of different sizes differently, particularly as classifications of cities and school districts based upon population are deemed general legislation and are specifically authorized by our state Constitution. *See* PA. CONST. art. III, § 20; *DeFazio*, 562 Pa. at 436, 756 A.2d at 1105. Here, the Legislature found that some urban municipalities in Pennsylvania and elsewhere are attempting to solve the seemingly intractable problems facing their school districts by adopting mayor-led models of control and remediation. In our view, the Legislature could reasonably have believed that social issues interrelated with education, such as crime, poverty, and a weak tax base, are more severe in urban school districts than in rural ones, and sufficiently so to warrant special treatment under the EEA. *See generally Danson v. Casey*, 33 Pa.Cmwlth. 614, 624 & n. 13, 382 A.2d 1238, 1243 & n. 13 (1978) (recognizing the financial plight of urban school districts and the fact that municipal services in such areas cost more than in rural areas (citing Comment, *Pennsylvania's State Aid to Education Formula: A Goal of Uniform Equalized Education*, 30 PITT. L.REV. 41 (1968–69))), *aff'd* 484 Pa. 415, 399 A.2d 360 (1979); *Abbott v. Burke*, 119 N.J. 287, 575 A.2d 359, 363, 394–408 (1990) (cataloguing the special educational problems and needs of students in poorer urban school districts, and observing that, even apart from increased funding, "new approach[es]" are needed to ensure that the students in such districts receive a good education).

Additionally, we agree with Appellants that the Legislature could reasonably have sought to limit the program initially to cities with a mayor-led government in which the mayor is accountable to the same local electorate that makes up the

has a population of between 30,000 and 250,000, *see* 24 P.S. § 2–202, and third class cities are those with a population of less than 250,000, *see* 53 P.S. § 101. In light of the coterminality requirement and the criterion that the city has over 45,000 residents, Act 91's requirement that the school district be of the second class is superfluous. Furthermore, the criterion that the school district has a history of severe failure is not, strictly speaking, part of the class definition; rather, it is the condition triggering immediate certification as an empowerment district.

school district. This condition has the benefit of providing the individual who retains ultimate authority over the board of control (i.e., the mayor) with the greatest political incentive to ensure that effective means are implemented to improve the performance of the school district involved. *Accord Hickok II*, 781 A.2d at 229 (indicating that "it may be rational to have a Mayor whose municipality is coterminous ... with a school district to appoint the Board of Control to ensure continuing local control and increased local support").

Furthermore, while other third-class cities may have a mayor, *see* 53 P.S. § 35701, the increased local control inherent in cities governed under a home rule paradigm constitutes a sufficient basis for the General Assembly to have concluded that Act 91's provisions should be limited, at least initially, to cities with a home-rule, mayor-council form of government under the Charter Law. In particular, the General Assembly could reasonably have concluded that, as with Philadelphia, such conditions would lend themselves to the mayor "hav[ing] significant input into the development and implementation of any school district improvement plan adopted." 24 P.S. § 17–1707–B(a)(2).

Finally, although, as noted by the Commonwealth Court, these restrictions collectively narrow the class of school districts eligible for expedited treatment under Act 91 to a small number, we believe that it was rational for the General Assembly to seek to limit the program's initial reach to a small group of districts before prescribing the same procedures more generally throughout the state. Such is consistent with the codified legislative findings, which indicate that the effectiveness of a mayor-led system of school governance should be assessed under the act's "pilot program" before being made more generally available.[16] Moreover, there is nothing improper about this method of attacking social problems of statewide dimension, as the Legislature is free, for reasons of

---

**16.** Appellees are correct in stating that Article III, Section 32 does not have a "pilot program exception." The relevant inquiry, however, is not whether such an exception exists, but whether the particular pilot program here at issue constitutes special legislation. For the reasons stated, we believe that it does not.

necessity or otherwise, to address such issues incrementally. *See Maurer v. Boardman*, 336 Pa. 17, 27, 7 A.2d 466, 473 (1939) ("An act designed to remedy an existing ill may not be declared invalid because it leaves other ills unremedied."). Even to the extent that the Harrisburg School District is the only member of the class so far to be automatically certified as an empowerment district, the Secretary contends, and Appellees concede, that it is possible for other school districts to be subject to automatic certification in the future.[17] Hence the class is not "closed," but open for other members to come in. *See Harristown Dev. Corp. v. Commonwealth, Dep't of Gen. Servs.*, 532 Pa. 45, 53 n. 9, 614 A.2d 1128, 1134 n. 9 (1992) (indicating that "a classification of one member is not unconstitutional so long other members might come into that class" (citing *Haverford Township v. Siegle*, 346 Pa. 1, 6, 28 A.2d 786, 789 (1942))).

Under these circumstances, we do not believe that the class defined by Act 91 is based upon artificial or irrelevant distinctions utilized merely to evade the constitutional prohibition on special legislation; we hold, rather, that it is a classification which is reasonably related to the Commonwealth's legitimate interest in, and the General Assembly's constitutional duty to ensure, the existence of a "thorough and efficient system of public education." PA. CONST. art. III, § 14. Consequently, we conclude that Act 91 is consistent with both Article III, Section 32 of the Pennsylvania Constitution and the Equal Protection Clause of the United States Constitution.[18]

17. As noted, Appellees admitted in their complaint, and Appellants alleged in their answer, that the class is presently open to more than one member. We note additionally that other factors may operate to broaden the class. For example, a school district can enter the class if it grows to more than 45,000 residents.

18. Appellees suggest that the existence of a rational basis is not determinative. They argue in particular that the Legislature's true purpose was simply to "figure[ ] out another way to say 'Harrisburg,'" and complain that Appellants "jump directly to rational basis" without acknowledging the prohibition on evading constitutional constraints through artificial, irrelevant distinctions. *See* Brief at 14. This Court has clarified, however, that the existence of real and relevant distinctions in the subjects classified is the touchstone of the inquiry under both Section 32 and the Equal Protection Clause. *See Hickok I*, 563 Pa.

## B. Form of Government

█ The Commonwealth Court struck down Act 91 upon the alternative ground that, in its view, the statute improperly vests powers in the mayor of Harrisburg without approval of the Harrisburg voters. As discussed, the court viewed this as inconsistent with the Charter Law, in that the mayor-council plan of government does not grant the mayor authority to appoint a board of control for the school district. Appellees likewise contend that giving the mayor power to appoint such a board violates Article IX, Section 3 of the Pennsylvania Constitution, *see supra* note 8, in that it effects a modification in the "form" of Harrisburg's government after the voters had already made a selection of governmental structure pursuant to the Charter Law.

While there is some appeal to the proposition that giving the mayor any duties or responsibilities which are not specifically enumerated in the Charter Law effects a change in the form of government because the voters did not opt for a plan in which the mayor possessed such responsibilities, *see Hickok II*, 781 A.2d at 234, it should also be recognized that the Charter Law specifically imbues the mayor with general enforcement authority over "all general laws applicable thereto." 53 P.S. § 41412; *see also* 53 P.S. § 41301 (specifying that, once a city chooses its optional plan, the city is thereafter governed by the plan as well as "by all applicable provisions of general law"). Any city that adopts a mayor-council form of government under the Charter Law thus implicitly endorses the principle that, in addition to local ordinances, the city will be bound by applicable general laws subsequently enacted by the Legislature. As we have already determined that Act 91 is not a special law, it is a general law that is "applicable

at 397, 761 A.2d at 1136. While Appellees' focus upon intent may be reflected to some degree in the *Hickok I* Court's admonition that the General Assembly may not rely upon artificial distinctions in order to evade the constitutional prohibition, *see id.*, ultimately this factor and the question of a rational basis are two sides of the same coin: if the court finds that real and rational distinctions in the subjects classified are present, it will not assume an evasive intent on the part of the Legislature.

thereto," that is, to Harrisburg and any other city in the class defined by its terms. *See Hickok I,* 563 Pa. at 397, 761 A.2d at 1136 (observing that legislation for a class is general, not special); *Seabolt v. Commissioners of Northumberland County,* 187 Pa. 318, 323, 41 A. 22, 23 (1898) (same). The act is therefore consistent in principle with the general grant of mayoral powers contained in the Charter Law.

The question, then, distills to whether, as Appellees contend, Act 91 violates Article IX, Section 3 by somehow altering the "form" of government selected by the voters of Harrisburg or other cities in the relevant class. This is the central inquiry because the constitutional provision at issue pertains specifically to the selection by municipalities of an optional "form" of government. *See* PA. CONST. art. IX, § 3.

■ "Form" is defined variously, and most relevantly, as "the organization, placement, or relationship of basic elements," and "the structure, organization, or essential character of something, as opposed to its matter." WEBSTER'S COLLEGIATE DICTIONARY 515 (2d rev'd & updated Random House ed.2000). In this respect, we agree with Judge Leadbetter that Section 3 of Article IX does not *per se* preclude a legislative grant of particularized powers and duties to the mayor of a city that has opted for a mayor-council form of government, but refers instead to a wholesale change of municipal government. *See Hickok II,* 781 A.2d at 239 (Leadbetter, J., dissenting). So long as the addition of such duties is not inconsistent with the basic existence, structure, and powers of the office of mayor or the other branches of city government, it does not alter its form.

This reading is also consistent with the provisions of the Charter Law itself. Those applicable to all optional plans tend to focus upon such things as the size of the city council, *see* 53 P.S. § 41213, and the manner in which city officials are elected, *see* 53 P.S. § 41241, while the provisions pertaining specifically to the mayor-council plan deal with: identifying

the city's elected officials (i.e., the mayor, the city council, the treasurer and the controller), *see* 53 P.S. § 41402; the length of terms of office, *see* 53 P.S. § 41403; the size of the city council, *see* 53 P.S. § 41404; the manner in which vacancies are filled, *see* 53 P.S. § 41405; the separation of powers between branches of government, *see* 53 P.S. §§ 41407, 41411; the manner in which local ordinances are enacted, *see* 53 P.S. § 41413; whether and how a department of administrator is established, *see* 53 P.S. § 41416; and the preparation of a city budget, *see* 53 P.S. § 41418. None of these provisions purport to identify an exhaustive list of mayoral duties, and we decline to adopt an interpretation of the Charter Law under which the mayor's responsibilities as enumerated in that statute can never be augmented because they define the governmental structure. Accordingly, as Act 91's grant of authority to the mayor to appoint a board of control for the school district does not interfere with the existence, structure, or powers of the mayor or any other branch or function of city government prescribed by the mayor-council optional form of government under the Charter Law, we hold that it does not change the form of such government in violation of Article IX, Section 3.

## C. Conclusion

Since preliminary objections were sustained as to Counts IV and V, and our analysis is dispositive with respect to Counts I, II, and III, relief is unavailable on the complaint and further proceedings in this matter are unnecessary. *See Bensalem Township Sch. Dist. v. Commonwealth,* 518 Pa. 581, 586–87, 544 A.2d 1318, 1321 (1988) (explaining that, where relief is unavailable to the party who moves for judgment on the pleadings, entry of judgment for the non-moving party is appropriate).

Accordingly, the order of the Commonwealth Court is reversed, and the matter is remanded for entry of judgment in favor of Appellants.

Justice LAMB files a dissenting opinion.

Justice LAMB Dissenting.

Because I believe that Act 91 [1] is special legislation passed in violation of Article III, Section 32 of the Pennsylvania Constitution, I respectfully dissent. In promulgating Act 91, the Legislature has singled out the Harrisburg School District for special treatment, under the pretext of testing the efficacy of a "pilot program" for distressed systems of education. The amended Section 1707–B [2] targets Harrisburg in a less obvious way than the Reed Amendment,[3] and as drafted, could theoretically apply to both Harrisburg and Erie, as they are the only two cities meeting the form of government and population criteria. However, I do not agree that the mere possibility that the Erie School District might find itself distressed before December of 2005 mandates against a finding that Act 91 is special legislation.

Act 91's classification is no less effective in singling out the Harrisburg School District for special treatment than the Reed Amendment. It is, in my view, nothing more than a thinly veiled attempt by the Legislature to promulgate special legislation under the guise of a general law. Were the purpose of this legislation really the remediation of failing urban school districts, such could have been achieved through the passage of general laws. The only possible purpose of Act 91 is the evasion of the constitutional limitation ran afoul of in *Harrisburg Sch. Dist. v. Hickok (Hickok I)*, 563 Pa.391, 761 A.2d 1132 (2000). As such, it must fail.

By its opinion today, the majority has placed its imprimatur on legislation passed in disregard of the constitutional limitation contained in Article III, Section 32. Because I can not abide the Legislature's evasion of the constitutional limitation contained therein, I would affirm the order of the Commonwealth Court. Accordingly, I must respectfully dissent.

---

1. Act of November 22, 2000, P.L. 672, No. 91, § 9.

2. Section 1707 B of the Act of May 10, 2000, P.L. 44, No. 16, § 8.1, *as amended*, 24 P.S. §§ 17–1701–B to 17–1716–B.

3. Section 1707 B of the Act of May 10, 2000, P.L. 44, No. 16, § 8.1, 24 P.S. §§ 17–1701–B to 17–1716–B.